JAMES A. MANN, INC.

v.

The UNITED STATES.

No. 89–75.

United States Court of Claims.

May 12, 1976.

Bernard Glassman, Philadelphia, Pa., for plaintiff. Erwin Lodge, Philadelphia, Pa., attorney of record. Blank, Rome, Klaus & Comisky, Philadelphia, Pa., of counsel.

Susan M. Linden, Washington, D. C., with whom was Asst. Atty. Gen., Rex E. Lee, Washington, D. C., for defendant.

Before DAVIS, SKELTON and BENNETT, Judges.

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

SKELTON, Judge.

This is an appeal by the plaintiff, James A. Mann, Inc., (contractor or plaintiff), from an adverse decision of the General Services Administration Board of Contract Appeals (Board), which decision required the contractor to furnish and install a 200KW natural gas driven engine-generator, which cost $32,867.63, in the Federal Building in Philadelphia, Pennsylvania, under a contract with the Government for "Modernization, Painting, and Emergency Power" of such building. The contractor contended before the Board, and contends here, that the contract terms required the engine-generator to be furnished by the Government, or in the alternative, that the contract was ambiguous in this regard and the ambiguity should be resolved against the Government who drafted the contract, which would require the Government to furnish the engine-generator. As stated above, the Board decided the case in favor of the Government and the contractor appealed to this court under the Wunderlich Act, 41 U.S.C. § 321 (1970) claiming that the decision of the Board was arbitrary, capricious, and not supported by substantial evidence. The case is before us on cross-motions for summary judgment. After reading the pleadings and briefs, hearing oral argument, and reading the entire record of the proceedings before the Board, we hold for the Government and affirm the decision of the Board.

The General Services Administration (GSA) issued invitations for bids (IFB) on December 16, 1971, which contained various sections, some of which are not material here. Sections 14A–1 through 14A–56.2 dealt with elevators. Of those sections, only Section 14A–20 is material to this case. It provided as follows:

14A–20 *Control—Motor Generator Sets*

20.1 Existing motor generator sets shall be reused.

a. Cars # 5 & 6: New four stem brush rigging shall be provided on the exciter. New bronze bearings shall be installed. The set shall be disassembled to degree necessary to thoroughly clean and insulate with one coat of insulating varnish. New brushes of manufacturer's recommended grade shall be installed. The commutators on the exciters and generators shall be turned and undercut. A new exciter armature shall be installed on car # 5 generator.

b. Cars # 9 & 10: Existing motor generator sets shall be reused. The set shall be cleaned and, if necessary, new bearings installed, the commutators turned and undercut. New brushes of manufacturer's recommended grade installed.

Sections 16A–1 through Sections 16A–2e under the heading of General Provisions, provided as follows:

### SECTION 16–A
### GENERAL PROVISIONS

General

16A–1 *Scope of Work*

1.1 The work covered by this Section of the Specifications consists in furnishing all labor, materials, equipment and accessories and in performing all operations in connection with the installation of the specified material, complete, and in strict accordance

with this Section of the Specifications and the applicable Drawings, and subject to the requirements of the "General Provisions," "General Conditions," and "Special Conditions" of this specification.

### 16A–2 *Work Included*

2.1 Furnish all labor, materials, tools, and other necessary equipment to install complete electrical systems in accordance with the Drawings and Specifications. The reasonable intent of the Drawings and Specifications shall dictate.

2.2 The work to be performed under this Division shall, in general, comprise the following:

a. Service entrance equipment.

b. Complete distribution system for all utilization equipment, including feeders, distribution panelboards, branch circuits, bus duct, and circuit protective devices.

c. Installation of all lighting.

d. Power supply and connection of miscellaneous equipment supplied under this and other Divisions.

e. Installation of M. G. sets & controls supplied by using Agency.

Other specifications material to this case deal with Emergency Elevator Power, Emergency Lighting and the Emergency Power System. So that the pertinent provisions of these specifications may be considered, they are set forth in pertinent parts as follows:

### SECTION 16–F
### EMERGENCY ELEVATOR POWER

### 16F–1 *General*

1.1 An Elevator Emergency Power Transfer System shall be provided so that in the event of a reduction to 90% or less of nominal voltage of the normal service and the presence of an emergency service at 90% or more of nominal, the system will automatically permit the operation of two elevators at a time on the emergency service.

1.2 The system shall allow operation of all elevators in any sequence when they are connected to the normal service.

1.3 Upon restoration of all phases of the normal service to 95% or more for an adjustable period of up to 2 minutes maximum, all elevators shall resume normal operation and the elevator connected to the emergency service shall automatically be re-transferred.

1.4 A separate Remote Selector Panels shall be furnished to allow for the selection of two elevators at a time to be operated on the emergency service. Selection of elevators shall be in any sequence and shall not be restricted by equipment design, to a pre-set sequence of selection. The remote selector shall be locked-out of operation when the system is in the normal mode of operation.

1.5 The basic design concept of the system shall be to make emergency power available to a selected elevator without any modification of the elevator controls. There shall be no inter-wiring required between the Elevator Emergency Power Transfer System and the elevator equipment furnished by the elevator manufacturer beyond the connection of the main power conductors.

1.6 The Elevator Emergency Power Transfer System shall be a Bulletin 940–356, as manufactured by the Automatic Switch Company.

\*     \*     \*     \*     \*     \*

### 16F–3 *Operation*

3.1 Upon normal service failure, control of elevators is transferred to the Remote Selector Panel with all power being derived from the emergency riser.

3.2 When emergency service is available, push-buttons 1 to 4 will light Amber signaling that sequencing of elevators may begin.

3.3 The operator can select any elevator to be connected to the emergency source by pushing the button for that elevator. The color of the light will

go from Amber to Red, signaling that the selected elevator is being powered by the emergency service.

3.4 To select another elevator in any sequence, the push-button for the elevator on the emergency service is depressed. The light goes from Red to Amber. The button for the next elevator is then depressed.

3.5 The system is so arranged as to allow two elevators at a time to be connected to the emergency service.

3.6 After the normal service has returned and stabilized, the system will automatically return to normal operation and lock-out the Remote Selector. This is indicated by the Green "N" lamp coming on and remaining lit while the system is in normal operation.

The above Sections 16F–1 through 16F–1.6 and 16F–3 through 16F–3.6 show how at least two of the eleven elevators could be operated from the emergency power system, hereinafter described, if there should be a failure of the regular electrical supply of energy. Provision was also made for emergency lighting in the building by use of the emergency power system if regular power failed. The emergency lighting provisions were as follows:

SECTION 16–G
EMERGENCY LIGHTING

16G–1 *General*

1.1 The work covered by this Section of the Specifications consists in furnishing all labor, materials, equipment and accessories and in performing all operations in connection with the installation of the specified materials, complete, and in strict accordance with this Section of the Specifications and the applicable Drawings, and subject to the requirements of the "General Provisions," "General Conditions," and "Special Conditions" of this Specification.

16G–2 *Requirements*

2.1 Furnish and install the lighting equipment as shown on the Drawings and specified herein.

2.2 All electric fixtures shall be erected and shall hang perfectly plumb with canopies set squarely against the wall or ceiling, and shall be completely wired with slow burning type of asbestos covered wire, according to NEC rules. Flush mounted recessed fixtures shall be installed so as to completely eliminate light leakage between the frame and the finished surface. Fixture housing, frame or canopy shall provide a suitable cover for the fixture outlet box or fixture opening.

2.3 Contractor shall disconnect existing fixtures, as indicated on drawings, from existing circuits and reconnect on normal/emergency circuits as indicated.

2.4 Contractor shall rewire existing circuit to insure proper operation of lights on remaining existing circuit.

The sections dealing with the emergency power system, with which we are chiefly concerned in this case, required the contractor to *furnish and install* the 200KW gas driven engine-generator that is in controversy here. These sections provided in pertinent part as follows:

SECTION 16–H
EMERGENCY POWER SYSTEM

16H–1 *Engine—Generator*

1.1 *The Electrical Contractor shall furnish and install* a 200 KW, 120/208 volt, three phase, 4 wire, 695 amperes, 0.8 power factor, city water cooled, natural gas driven generator, Pennsylvania approved, as manufactured by Onan, Model 200WC–4R8–31, or similar by Kohler Co., or approved equal.

1.2 The generator and engine shall be direct connected with semi-flexible coupling vibro-mounted on a steel skid base.

1.3 The engine shall be city water cooled, natural gas driven, 6 cylinder, 4 cycle, not less than 1197 cubic inch displacement developing 430 BHP, at a governed speed of 1800 rpm. Mechanical governor shall maintain speed regula-

tion within 5%. Belt-driven governor is not acceptable. It shall include a filter, flow control valve, automatic solenoid shut-off valve, secondary regulator, electric solenoid gas shut-off valve, flexible fuel line, flexible exhaust line, muffler and radio suppression. Starting shall be accomplished by exciter cranking directly connected to the engine crankshaft and capable of withstanding continuous cranking for not less than five minutes. Automotive starting shall not be considered.

1.4 Generator shall be revolving field, direct connected to engine crankshaft with automatic voltage regulation with plus or minus 2%. Generator shall include protection feature to maintain voltage during motor starting. It shall be self-ventilated, of drip-proof construction meeting NEMA, AIEE, and ASA standards for temperature rise.

The unit shall have a vibro-mounted control panel mounted on exciter frame containing a voltmeter, selector switch, start-stop switch, over-cranking protection arranged to open cranking circuit in 60 to 90 seconds, cranking reset button and automatic two-step battery charging feature.

A Pennsylvania approved battery charger with an adjustable trickle low charge rate variation up to 300 milliamperes and high charge rate up to 2 amperes. Charger shall be complete with ammeter, high rate lamps and adjustable rheostat enclosed in NEMA 1 enclosure. Batteries furnished shall be of sufficient capacity to crank engine continuously for at least five minutes at sufficient speed to start engine. Batteries shall be approved type registered by the State of Pennsylvania.[1] [Emphasis supplied.]

These specifications relating to the engine-generator or any other part of the Emergency Power System were never changed, except by Amendment No. 6 of January 14, 1972, which provided as follows:

*Specifications*
S–1: Section 16–H, Emergency Power System, Paragraph 16 H–1, Engine Generator, subparagraph 1.1:

a. CHANGE "Onan, Model 200 WC–4R8–31" to read: "Onan, Model 200 FT."

b. ADD new subparagraph to read as follows: "1.1.1 Generator shall be suitable for operation on gas pressure available at the site."

The contractor acknowledged receipt of this amendment in its bid on this contract.

On April 17, 1972, Amendment No. 8 was issued by the contracting officer of the Government. The contractor contends that this amendment created an ambiguity in the contract, which will be discussed below. Amendment No. 8 provided in pertinent part as follows:

*S–6:* Section 2, Special Conditions:
(a) Paragraph 2–3, BIDS: Delete paragraph in its entirety and substitute in lieu thereof the following:

"2–3 BASE BID
3.1 One lump sum bid is required."

(b) Paragraph 2–4 ALTERNATES: Delete paragraph in its entirety and substitute in lieu thereof the following:

"2–4 ALTERNATES
4. Alternate prices are required, stating amount to be deducted from the lump sum Bid for making each of the following changes, including all adjustments as required by such changes:[2] Alternate F for omitting an emergency power system for: The operation of any two elevators; emergency lighting

1. There were two more pages of detailed specifications relating to the Emergency Power System, extending through Sections 16H–3.4, that are not set forth here. However, they are important to show the extent of the system and its vital connection with the whole project, as well as to show the contractor the importance of the system and to alert it as to its duties and obligations with reference thereto.

2. Alternates A, B, C, D, and E set forth in the Amendment are not involved in this case.

in public corridors and stair halls; minimum operation of essential mechanical equipment, including water and sewage ejector pumps.

Note: No elevator work, except as described in Alternate F and Section 16–F, EMERGENCY ELEVATOR POWER, is to be performed under this contract.

4.2. The lump sum Bid reflects the desired requirements for the project as shown and specified. Alternates provide for certain omissions or substitutions at the option of the Government. Any award which includes Alternates will be made on the basis of the lowest aggregate bid resulting from the amount of the lump sum Bid less the amount of the Alternate or Alternates as may be accepted by the Government. The Government reserves the right to accept or reject any and all alternate prices as may be determined by the Contracting Officer to be in the best interest of the Government.

*S–7: Section 14A, Elevators:*

Delete section in its entirety and substitute in lieu thereof the following:

"Section 14A not used."

The IFB also required each bidder to submit a list showing the name and address of the firm to whom he proposed to subcontract each of the categories of work listed in the bid form, in pertinent part as follows:

2.25. *Listing of Subcontractors*

25.1 For each of the categories of work contained in the list included as part of the Bid Form, the bidder, shall submit the name and addresses of the firm to whom he proposes to subcontract the work.

Plaintiff submitted its bid on May 2, 1972, for a lump sum of $1,247,000, without any alternates, and also with six alternate bids (A, B, C, D, E, & F) whereby plaintiff proposed to deduct the amount specified for nonperforming each alternate, respectively, from the lump sum bid should the Government exercise its option to accept any or all of the alternate proposals. The plaintiff's bid was in pertinent part as follows:

In compliance with the above-dated invitation for bids, the undersigned hereby proposes to perform all work for modernization, painting and emergency power at the Federal Building, 225 South 18th Street, Philadelphia, Pennsylvania in strict accordance with the General Provisions (Standard Form 23–A), Labor Standards Provisions Applicable to Contracts in Excess of $2,000 (Standard Form 19–A), specifications, schedules, drawings, and conditions, for the following amount:

*One million two hundred forty seven thousand and 00/100* Dollars *($1,247,000.00)*

\* \* \* \* \* \*

*DEDUCT ALTERNATE F* for omitting all work relating to providing an emergency power system for the operation of any two elevators; emergency lighting in public corridors and stair halls; minimum operation of essential mechanical equipment, including water and sewage ejector pumps as specified in Section 2, SPECIAL CONDITIONS, paragraph 4, ALTERNATES, and in Section 16–F, EMERGENCY ELEVATOR POWER, Section 16–G, EMERGENCY LIGHTING and Section 16–H, EMERGENCY POWER SYSTEM:

*One hundred four thousand and 00/100 Dollars ($104,000.)*

\* \* \* \* \* \*

Note: Government to furnish MG equipment according to Spec. 16A–1.

Elevator operator to be provided by owner according to Spec.

Attached to plaintiff's bid was a list of subcontractors and their addresses to whom it expected to subcontract the various phases of the work. This list showed that it expected to subcontract to Seaboard Elec. Co., 1913 Wharton Road, Jenkentown, Pennsylvania, all of the work in the following categories:

SECTION 16–F

EMERGENCY ELEVATOR POWER

SECTION 16–G
EMERGENCY LIGHTING
SECTION 16–H
EMERGENCY POWER SYSTEM

The bids were opened on May 2, 1972, the same day plaintiff submitted its bid. The plaintiff was second lowest bidder, but was advised by letter dated June 1, 1972, that its lump sum bid of $1,247,000 had been accepted (without alternates).[3] The letter contained the following notation:

> Liq. damages in spec.: $115 per c. d. for all work *except emergency power system shall be $50 per c. d.* [Emphasis supplied.]

A notice to proceed was issued by the Government for work to begin on the contract on July 6, 1972. During the first part of August 1972, the plaintiff took the position that by reason of Amendment No. 8, which eliminated all elevator work from the contract as set forth in Section 14A and in particular Section 14A–23.1 that provided:

> Existing motor generator sets shall be reused

but did not remove Section 16A–2.2e which provided for the following work:

> Installation of M. G. [motor generator] sets and controls supplied by using agency

caused the contract to be ambiguous and that Section 16A–2.2e referred to the gas driven engine—200KW generator in Section 16H, and, therefore, the Government was required to furnish it instead of the plaintiff. The plaintiff said further that it called this ambiguity to the attention of the contracting officer by its note written on its bid (quoted above). During the performance of the contract the plaintiff asked the contracting officer for a decision on this question, which was made by the contracting officer adverse to the position of the plaintiff, and it was ordered by the contracting officer to furnish and install the engine-generator as required by Section 16H. The contractor appealed to the Board, which, after an evidentiary hearing in which the contractor participated, rendered a decision holding that the contract

and the facts required the contractor to furnish and install the engine-generator. The plaintiff then filed this suit in which it takes the same position it took with the contracting officer and the Board and makes the same arguments it previously made, as stated above.

We think that the plaintiff is clearly wrong and is twisting the plain meaning of the contract with reference to its obligation to furnish and install the engine-generator in such a way that the contract provisions are meaningless and the intent of the parties is subverted. There was no connection between the "M. G. sets and controls" in Sections 14A–23.1 and 16A–2.2e on the one hand and the "engine-generator" in 16H on the other. If the plaintiff was confused because 14A–23.1 was removed from the contract by Amendment No. 8 when 16A–2.2e that dealt with the same M. G. sets and controls was not deleted by section number, such confusion was only related to the M. G. sets and controls and had nothing whatever to do with the engine-generator in Section 16H. The plaintiff was not called on to furnish M. G. sets and controls and its argument about them is irrelevant and meaningless as far as its obligation to furnish and install the engine-generator is concerned. There is no basis for plaintiff to try to confuse M. G. sets and controls with the engine-generator, because they are entirely different. The evidence of two engineers at the Board hearing showed that M. G. sets were electrical devices that were attached to and placed on top of the eleven elevators in the building for the purpose of converting alternating electric current to direct current to operate the elevators. On the other hand, the engine-generator was described in the contract as a 200KW, 120/208 volt, three, phase, 4 wire, 695 amperes, 0.8 power factor, city water cooled, natural gas driven generator, 6 cylinder, 4 cycle, not less than 1197 cubic inch displacement, developing 430 BHP at a governed speed of 1800 RPM, etc. (See Sec. 16H–1 to 16H–1.5 quoted in full above.) Any qualified engineer or electrician would know the

---

**3.** The low bidder was disqualified.

difference between such an engine and M. G. sets and controls. It is obvious that the plaintiff did also.

Furthermore, plaintiff was on notice by Section 14A–20.1, quoted above, that some of the existing motor generator sets were on elevator cars 5, 6, 9, and 10. It was further on notice by Sections 14A–22.1 and 14A–23 that some of the existing controllers were on elevator cars 5, 6, 9 and 10, and that the purpose of the controllers on cars 5 and 6 was to control "starting, stopping and the speed of the *elevator motor* and also to automatically apply the brake." (Emphasis supplied.) It can be assumed that the controllers on the other elevator cars performed the same functions. In any event, the indicated specifications informed the plaintiff as to the location and functions of the motor generator sets and controllers.

On the other hand, Section 16H described the gas driven 200KW engine-generator in great detail. It was obviously a heavy piece of equipment and *was to be located in the sub-basement,* as shown on Drawing 9–E–21. The plaintiff was on notice as to these facts.

Anyone, whether he be a competent engineer or electrician, or even a school boy, would know from these facts that the elevator motor generator sets and controls on the elevators were not the same as the gas driven 200KW engine-generator in the sub-basement of the building. The argument of the plaintiff that Section 16A–2.2e provides "Installation of M. G. sets and controls supplied by using agency" refers to the gas driven 200KW engine-generator is patently absurd.

All of the facts show that the plaintiff knew it was required to furnish and install the engine-generator and that it actually expected to do so when it made its bid and signed the contract. These facts may be listed as follows:

(1) The IFB (Sec. 16–1.1) stated in plain and unequivocal language that—

*The electrical Contractor shall furnish and install* a 200KW * * * natural gas driven generator * * *. [Emphasis supplied.]

This requirement was never changed.

(2) Amendment No. 8 required the plaintiff to submit an alternate bid (Alternate F) showing the amount it would deduct from its lump sum bid if the Government omitted from the contract the provisions of the emergency power system.

(3) The plaintiff submitted alternate bid F in which it proposed to deduct $104,000 from its lump sum bid if the Government would omit the emergency power system as specified in Sec. 16F (Emergency Elevator Power), Sec. 16–G (Emergency Lighting), and Sec. 16–H (Emergency Power System).[4] The Government declined to exercise its option to delete these sections from the contract. Consequently, plaintiff was well aware that it was required by the contract to furnish and install the engine-generator and to do the other work required by these sections.

(4) The plaintiff attached to its bid the name and address of the subcontractor (Seaboard Elec. Co.) who would do the work required by Sections 16–F, 16–G and 16–H of the contract, showing that it well knew it would have to comply with the requirements of these sections.

(5) The letter from the Government of June 1, 1972, notifying plaintiff it had been awarded the contract contained a notation that liquidated damages for the power system would be "$50 per c. d." The plaintiff signed the contract with knowledge of this notation.

(6) The contract that the plaintiff signed on June 1, 1972, provided in pertinent part as follows:

The United States of America (hereinafter called the Government), represented by the Contracting Officer executing this contract, and the individual, partnership, joint venture, or corporation named above (hereinafter called the Contractor), mutually agree to perform this contract in strict accordance with the General Provisions (Standard Form 23–A), Labor

4. Alternate F is quoted in full above.

Standards Provisions Applicable to Contracts in Excess of $2,000 (Standard Form 19–A), and the following designated specifications, schedules, drawings, and conditions: Specification for Modernization, Painting, and Emergency Power, Federal Building, 225 South 18th Street, Philadelphia, Pennsylvania dated December 16, 1971 and Amendments Nos. 1, 2, 3, 4, 5, 6, 7, and 8 thereto dated December 16, 29, 1971, January 4, 7, 6, 14, February 4, April 17, 1972, respectively, and Drawings Nos. 0–1, 3–1 through 3–40, 4–1, 5–1 through 5–5, 9–H–1 through 9–H–8, 9–E–1 through 9–4–18, and 9–4–21 through 9–4–35.

All of the specifications providing for the emergency power system were contained in the contract, including Sec. 16H–1 and Drawing 9–E–21 that required plaintiff to furnish and install the engine-generator. There is no reservation or exception by plaintiff in the contract as to its obligations under the contract nor supporting the arguments the plaintiff is now making, although a full month had elapsed since plaintiff made its bid.

(7) The plaintiff never sought to withdraw its bid or make any changes in the bid nor did it request the Government to make any changes in the contract because of what it now claims were ambiguities in the IFB, although it had a full month in which to do so.

(8) A drawing or map (9–E–21) which was attached to the IFB and which is listed in the contract quoted above, (and which was introduced into evidence at the Board hearing), shows the location of the then existing 60KW emergency generator in the sub-basement. The map bears the notation "*Replace* existing 60KW emergency generator with new 200KW unit." (Emphasis supplied.) This is proof that the plaintiff was on notice that it had to furnish and install a new 200KW generator as required by Sec. 16H–1 of the contract to replace the old 60KW generator in the sub-basement. The drawing is further proof, which was not disputed, that the Government did not possess an old 200KW generator in the building that it could furnish to plaintiff to be reused, as plaintiff now contends is the meaning of Sec. 16A–2.2e where it is recited "Installation of M. G. sets and controls supplied by agency." Such a contention is unreasonable. To confuse M. G. sets and controls (plural) that are located on top of the eleven elevators (in a *used* condition) with *one new* 200KW engine-generator to replace the old 60KW generator in the sub-basement is like confusing cats with dogs or apples with oranges. The pertinent portion of drawing 9–E–21 is as follows:

PARTIAL SUB-BASEMENT PLAN
SCALE ⅛" = 1'–0"

Plaintiff's present position is no doubt an afterthought, as it is inconsistent with its acts and conduct prior to and up to the time its bid was submitted.

■ We hold that the contract considered as a whole was not ambiguous as to the requirement that plaintiff was obligated to furnish and install a new gas driven engine-200KW generator, and this is especially true in view of the conduct of the parties and the relevant facts described in the foregoing paragraphs.

As stated above, the plaintiff has complained that the contract is ambiguous because Amendment No. 8 removed Section 14A–20.1 from the contract which provided that "existing motor generator sets shall be reused" but did not remove Section 16A–2.-2e which provided "installation of M. G. sets and controls supplied by using agency," which remained in the contract. In the first place, Sec. 16A–2.2e was effectively removed from the contract, although not by section number description, by the following provision of Amendment No. 8:

*No elevator work,* except as described in Alternate F and Section 16–F, EMERGENCY ELEVATOR POWER, *is to be performed under this contract.* [Emphasis supplied.]

The installation of M. G. sets and controls was clearly elevator work. Therefore, Sec. 16A–2.2e was deleted from the contract along with Sec. 14A–20.1 by this general language. Further proof of this deletion is the fact that the plaintiff did not install any M. G. sets and controls on the elevators, nor was it required to do so in the performance of the contract.

In the next place, if there was any ambiguity in the contract it was with reference to the sections last above described, which did no harm to plaintiff nor caused any loss to it, because it was not required to install any M. G. sets and controls and did not do so. Therefore, the alleged ambiguity, even if it existed, and we do not think it did, was immaterial and irrelevant to any issue in this case.

Furthermore, the alleged ambiguity was well known to plaintiff before it filed its bid. The plaintiff admits this to be true and says that is the reason it appended the note to its bid. In following this procedure, the plaintiff did not comply with the provisions of the IFB, which was a part of the Federal Procurement Regulations, FPRI–16.901–22, which provided as follows:

1. *Explanations to Bidders.* Any explanation desired by a bidder regarding the meaning or interpretation of the invitation for bids, drawings, specification, etc., must be requested in writing and with sufficient time allowed for a reply to reach bidders before the submission of their bids. Any interpretation made will be in the form of an amendment of the invitation for bids, drawings, specifications, etc., and will be furnished to all prospective bidders. Its receipt by the bidder must be acknowledged in the space provided on the Bid Form (Standard Form 21) or by letter or telegram received before the time set for opening of bids. Oral explanations or instructions given before the award of the contract will not be binding.

It is clear from this provision that if the plaintiff had any question about any part of the IFB or desired any explanation as to its provisions it was required to request an interpretation or explanation in writing with sufficient time for a reply to reach all bidders *before* the submission of their bids. The plaintiff did not do this. The note on its bid did not comply with this requirement. Consequently, plaintiff is in no position to complain.

Furthermore, the contract provided that if there was any discrepancy in the figures, drawings, or specifications, the matter shall be submitted to the contracting officer, who shall make a reply in writing. This provision of the contract was as follows:

2. SPECIFICATIONS AND DRAWINGS

The Contractor shall keep on the work a copy of the drawings and specifications and shall at all times give the Contracting Officer access thereto. Anything mentioned in the specifications and not shown on the drawings, or shown on the

drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of difference between drawings and specifications, the specifications shall govern. In case of discrepancy either in the figures, in the drawings, or in the specifications, the matter shall be promptly submitted to the Contracting Officer, who shall promptly make a determination in writing. Any adjustment by the Contractor without such a determination shall be at his own risk and expense. The Contracting Officer shall furnish from time to time such detail drawings and other information as he may consider necessary, unless otherwise provided.

■ Obviously, the plaintiff did not comply with this requirement of its contract. As stated above, without complying with this provision, the contractor proceeds "at his own risk and expense." *See Black, Raber-Kief & Associates v. United States,* 357 F.2d 355, 358, 174 Ct.Cl. 302, 308 (1966); *Jefferson Construction Co.. v. United States,* 364 F.2d 420, 423–24, 176 Ct.Cl. 1363, 1369 (1966), *cert. denied,* 386 U.S. 914, 87 S.Ct. 865, 17 L.Ed.2d 786 (1967); *J. A. Jones Construction Co. v. United States,* 395 F.2d 783, 789–90, 184 Ct.Cl. 1, 11–12 (1968); and *HRH Construction Corp. v. United States,* 428 F.2d 1267, 1272, 192 Ct.Cl. 912, 920 (1970).

■ Plaintiff contends that the contract was ambiguous and that under the "contra proferentem" rule all doubts should be resolved against the Government who drafted the contract and plaintiff's interpretation should be adopted, because it is reasonable. While this rule is well established, it does not apply in this case where the plaintiff knew of the alleged ambiguity *before* it submitted its bid. Under these circumstances it was incumbent on the contractor to bring the matter to the attention of the Government. The correct rule is stated in *Beacon Construction Co. v. United States,* 314 F.2d 501, 504, 161 Ct.Cl. 1, 6–7 (1963) as follows:

* * * The bidder who is on notice of an incipient problem, but neglects to solve it as he is directed to do by this form of contractual preventive-hygiene, cannot rely on the principle that ambiguities in contracts written by the Government are held against the drafter (*e. g., Peter Kiewit Sons' Co. v. United States,* 109 Ct.Cl. 390, 418 (1947)). Even more, the bidder in such a case is under an affirmative obligation. He "should call attention to an obvious omission in a specification, and make certain that the omission was deliberate, if he intends to take advantage of it." *Ring Construction Corp. v. United States,* 162 F.Supp. 190, 192, 142 Ct.Cl. 731, 734 (1958). See also, to the same effect, *Jefferson Constr. Co. v. United States,* 151 Ct.Cl. 75, 89–91 (1960). * * *

■ Plaintiff argues that *Beacon* is not applicable to its situation. It asserts that the ambiguity in *Beacon* was "patently obvious" while the alleged ambiguity in the present case was "not glaring." This distinction, even assuming it to be valid, is irrelevant. The question of whether an ambiguity is patent is *only* relevant where the contractor was not aware of it, and the court is called upon, in retrospect, to decide whether or not he *should have been* aware of it. *See Jack Stone Co. v. United States,* 344 F.2d 370, 375, 170 Ct.Cl. 281, 289–290 (1965); *Blount Brothers Construction Co. v. United States,* 346 F.2d 962, 171 Ct.Cl. 478 (1965); *Tufano Contracting Corp. v. United States,* 356 F.2d 535, 540, 174 Ct.Cl. 398, 407 (1966); *Boyajian v. United States,* 423 F.2d 1231, 1247, 191 Ct.Cl. 233, 260 (1970). It is clear in this case that the alleged ambiguity was known to the plaintiff before it submitted its bid. Its president admitted this to be true. Having this knowledge, plaintiff was required to seek clarification from the contracting officer. This it failed to do.

■ Plaintiff argues that the note on its bid was notice to the contracting officer that there was an ambiguity in the IFB and that this complied with the requirements of the IFB and of FPR 1–16.901–22. We do not agree. The note did not give notice of anything. It did not mention ambiguity, conflict, confusion nor ask any question; it

did not request an explanation or interpretation of any of the provisions of the IFB. The note did not mention the 200KW gas driven engine-generator required to be furnished by Sec. 16H–1.1 and Drawing 9–E–21 with which we are concerned here, but referred to Sec. 16A–1 which was a general provision that had no bearing on the question and was meaningless as far as the present controversy is concerned. The note used the "M. G." language of 16A–2.2e with reference to work that had been deleted by Amendment No. 8. The contracting officer reasonably concluded that the note was not notice of anything and that it did not call for any action on his part. The contracting officer stated:

> The language of the statement in [plaintiff's] bid is almost identical to the language contained in paragraph 16A–2.2e. Therefore, in this instance, I cannot see where repeating a statement which is contained in the contract specification could be considered a qualification to [plaintiff's] bid.

A comparison of the two phrases, "Installation of M. G. sets and controls supplied by using Agency" (Sec. 16A–2.2e) and "Government to furnish mg equipment according to Spec. 16A–1" (plaintiff's note) supports his interpretation of plaintiff's note.[5] We conclude that the note was meaningless and a nullity as far as giving notice of an alleged ambiguity or requesting an explanation of anything in the IFB was concerned. Having failed to give notice of the alleged ambiguity before bidding, as required by the contract and FPR 1–16.901–22, the plaintiff is legally precluded from recovering the cost of the engine-generator from the Government on the basis of the alleged ambiguity. *See Anthony Grace & Sons, Inc. v. United States*, 433 F.2d 766, 193 Ct.Cl. 248 (1970); and *Consolidated Engineering Co. v. United States*, 98 Ct.Cl. 256 (1943).

The Board found that the plaintiff did not meet its burden to call the Government's attention to the alleged ambiguity. The Board found further that the plaintiff did not present any evidence that it made any reduction in its bid price because of the alleged ambiguity. In fact, plaintiff's Alternate F bid, in which it offered to deduct $104,000 from its lump sum bid of $1,247,-000 if the Emergency Power System described in Sections 16F, 16G and 16H was omitted from the contract, is convincing evidence that the cost of the 200KW engine-generator, which Section 16H.1 required the plaintiff to furnish and install, was included in its lump sum bid. We think these findings of the Board were correct. Under these circumstances, a judgment against the Government in this case would amount to a windfall for the plaintiff. This would be unjust to the Government, as well as unfair to the other bidders.

We hold that the decision of the Board was correct, that it was neither arbitrary nor capricious and was supported by substantial evidence and should be affirmed.

Therefore, the decision of the Board is affirmed. Plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted, and plaintiff's petition is dismissed.

---

**5.** The contracting officer's interpretation is also supported by the other "note" to plaintiff's bid; "ELEVATOR OPERATOR TO BE PROVIDED BY OWNER ACCORDING TO SPEC," is, similarly, merely a restatement of another existing specification provision.