[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-14067

_____

D.C. Docket No. 5:12-cv-01708-IPJ

OTIS ELEVATOR COMPANY,

Plaintiff - Counter-Defendant - Appellee,

versus

WG YATES & SONS CONSTRUCTION COMPANY,
a.k.a. Yates Construction,

Defendant - Counter-Claimant - Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(October 17, 2014)

Before ED CARNES, Chief Judge, JORDAN and ROSENBAUM, Circuit Judges.

PER CURIAM:

This appeal arises from a three-day bench trial on a breach-of-contract claim. The district court determined that WG Yates & Sons Construction Company (Yates) breached its contract with Otis Elevator Company. Yates now appeals that judgment, contending that the district court committed six reversible errors.

## I.    BACKGROUND FACTS AND PROCEDURAL HISTORY

### A. FACTS

In 2008 the Huntsville-Madison County Airport Authority (Airport) decided to expand the airport's baggage-claim area. It hired Chapman Sisson Architects to prepare the plans and specifications for the expansion. The expansion included installing four new escalators. Chapman Sisson drafted two documents to specify the details for the escalators: the "Master Spec" and "Drawing A180."[1] Drawing A180, which lays out a detailed blueprint of the escalators and other features of the expansion, clarified the step width for the escalators. The step width of an escalator is the width of the stair treads where passengers stand. Escalators come in three standard step widths: 24 inches, 32 inches, and 40 inches. Manufacturers often vary a half inch from those measurements. For example, the "40-inch" escalator that Otis makes actually has 39.37-inch-wide steps, and the "40-inch" escalator that Schindler Elevator makes actually has 39.5-inch-wide steps. So the

---

[1] The Master Spec contained performance requirements, finishes, and other details for the escalators. It did not, however, specify exactly what the step width for the escalators should be.

2

step width provided in drawings and other plans (24 inch, 32 inch, or 40 inch) is understood to be an approximation and is referred to as the "nominal step width."

In its details of both the exterior and interior sets of escalators, Drawing A180 used "tick marks" to indicate that the escalator steps were to be 39.5 inches wide. This case grew out of a misunderstanding about whether those tick marks indicated that the steps themselves were to be 39.5 inches wide, or that the distance from handrail to handrail (the "rated width") on the escalators was to be 39.5 inches wide. Chapman Sisson and Yates thought Drawing A180 called for a 40-inch nominal step width, while Otis thought it called for a 39.5-inch rated width.

### 1.    The Bid Process

Yates decided to submit a bid on the general contract to handle the airport expansion project. To form its bid for the general contract, Yates solicited bids from subcontractors to handle various components of the expansion project, including the installation of the escalators. In soliciting bids for the escalator installation, Yates made Drawing A180 and the Master Spec available to all the bidders and instructed them that their bids had to conform to those requirements.

Otis was one of the companies that bid on the subcontract for the escalator installation. Trey Steber, Otis' new-equipment sales representative, prepared Otis' proposal. When Steber reviewed Drawing A180 and the Master Spec, he concluded that they were "unclear" as to the step width for the escalators. Despite

3

Steber noticing the ambiguity, neither he nor anyone else at Otis tried to clarify the step-width issue before submitting Otis' bid. Instead Otis assumed that 32-inch steps would be acceptable and submitted a proposal that used escalators with a 32-inch step width. Yates accepted Otis' bid because it was the lowest quote for the escalator installation. Yates then used Otis' bid as part of its own bid on the general contract. The Airport awarded the general contract to Yates because it was the lowest bidder.

2.     The Prime Contract, the Shop Drawings, and the Subcontract

After Yates was awarded the general contract, it still had to formalize its contract with the Airport and its subcontracts with Otis and the other subcontractors. The "Prime Contract" between Yates and the Airport had three features relevant to this appeal. First, the Prime Contract expressly incorporated Drawing A180 as part of its terms[2] and required Yates "to complete the work in strict accordance with said plans, specifications, and Contract terms." Second, it established that Chapman Sisson "shall decide all questions that may arise as to the interpretation and/or clarification of the specifications or plans relating to the work, the fulfillment of the Contract on the part of the Contractor, and the rights of different contractors on the project." Third, the Prime Contract required both Yates and Chapman Sisson to, before work began, review and approve all "Shop

---

[2] The Prime Contract's definitions section specifies that the Prime Contract "include[s] . . . the Specifications [and] the Plans . . . ."

4

Drawings . . . and similar submittals" from the subcontractors to ensure that they complied with the Prime Contract's requirement.  However, the Prime Contract made clear that Chapman Sisson's "[r]eview of such submittals is not conducted for the purpose of determining the accuracy and completeness of other details such as dimensions and quantities."

With the Prime Contract signed, Yates and Chapman Sisson began the process of reviewing and approving shop drawings as required by the Prime Contract.  Otis submitted shop drawings indicating that it would install escalators with a 32-inch step width.  Otis did not include any disclaimer or other notice to Yates that called attention to the fact that the shop drawings used 32-inch steps.  As is customary in the industry, Chapman Sisson did not conduct a "line item" review of the over 400 submittals it received from Yates' subcontractors.  Similarly, in keeping with industry custom and the terms of the Prime Contract, it did not check the shop drawings to ensure that their dimensions matched the Prime Contract's specifications.  When Chapman Sisson approved Otis' revised shop drawings,[3] it used a stamp that specifically qualified its approval by stating:  "This review is only for general conformance with the design concept of the project and general compliance with the information given in the Contract Documents."

---

[3] Chapman Sisson had, at the Airport's request, checked Otis' shop drawings to confirm that it included several details unrelated to the escalators' step width.  Because Otis' initial drawing had failed to include those unrelated details, it had to submit a revised shop drawing.

Yates also reviewed and approved the revised shop drawings. The stamp it placed on the shop drawings specified that Yates' review had been "for general compliance" and that the "[f]inal dimensions and quantities required for the project remain the responsibility of the subcontractor."

After the approval of Otis' shop drawings, Yates signed a separate contract with Otis (the Subcontract). Several of its provisions are relevant here. First, the Subcontract expressly incorporated "all terms and conditions of the Prime Contract," as well as "all drawings, specifications, details and standards." It provided that Otis had to complete the escalator installation "in strict accordance with this Subcontract and with the Prime Contract." Second, the Subcontract gave "the appropriate design professional" binding authority to resolve "any conflict, ambiguity, . . . or . . . difference in interpretation" of the Subcontract. Third, the Subcontract established that Yates' and Chapman Sisson's review and approval of shop drawings did not excuse Otis from performing its work in "strict accordance" with the project's plans and specifications. The Subcontract went on to emphasize that Yates had "no duty to discover any mistake, error, or deviation in any submittals from the Prime Contract requirements," and that Yates' and Chapman Sisson's approval of the submittals "shall not relieve [Otis] from responsibility or liability for any mistakes, error, or deviation, or of [Otis'] obligation to perform its work in strict accordance with the Prime Contract." Finally, the Subcontract had a

6

merger clause that limited the terms of the agreement to those written in the Subcontract itself and the documents incorporated by reference in the Subcontract.

### 3. The Airport Protests

Nobody noticed a problem with the escalators' step width until March 14, 2012. Chris Waters from Chapman Sisson performed bi-weekly site visits to monitor the progress of the expansion project, and his visit on March 14 was his first since the escalators were operational. In earlier visits there had been "plastic" and "barricades" around the escalators. While riding the escalators, Waters realized that they were narrower than what the plans had shown. After comparing Drawing A180 with Otis' shop drawings, Waters realized that the escalator steps were 32 inches when they should have been 40 inches.

When the Airport learned of the issue the next day, it demanded that all four escalators be replaced with 40-inch-step escalators. It also threatened Yates with the prospect of liquidated damages — $5,000 a day beginning April 20, 2012, and $7,500 a day beginning June 17, 2012. The Airport's threats prompted an exchange of letters between Yates and Otis. Yates sent a letter on March 20, 2012, that (1) informed Otis that the Airport had deemed the 32-inch steps to be out of compliance with the Prime Contract, (2) directed Otis to remove the two interior escalators and replace them with 40-inch-step-width escalators, and (3) reminded Otis that it was responsible for the escalators' failure to conform with the Prime

7

Contract.  Otis responded in a letter on March 21, 2012, dismissing Yates' position as "ridiculous" and claiming that Drawing A180 and the specifications were "cryptic" as to step width.  Otis also requested that Yates "work with us to persuade the [Airport] that such a step is unnecessary, time-consuming, an enormous waste of assets, and will certainly result in litigation."  Yates believed that Otis' request triggered Yates' obligation under the Subcontract to present Otis' position to the Airport and Chapman Sisson.  Yates responded on March 22, telling Otis it would "attempt to reach a resolution with the [Airport] but the onus rests on Otis to comply with the Contract Documents."  Otis replied the next day, confirming that it would participate in a meeting that Yates had arranged with the Airport and Chapman Sisson, but denying any contractual obligation to replace the escalators.

On March 26, 2012, all of the relevant parties — the Airport, Chapman Sisson, Yates, and Otis — met to discuss the escalators.  At the meeting, Otis presented its position by making five main arguments to the Airport and Chapman Sisson:

- The specifications and plans did not explicitly denote the step width;
- Another subcontract bidder had also proposed using 32-inch steps in its bid on the escalator subcontract;
- 40-inch escalator steps would not fit in the wellways provided by Drawing A180 and the Master Spec;
- Yates and Chapman Sisson both "approved" Otis' shop drawings with the 32-inch steps; and

8

- Either Yates or Chapman Sisson should have noticed the discrepancy earlier.

At the end of the presentation, the Airport rejected Otis' arguments, directed Otis and Yates to replace the escalators with 40-inch-step-width units, and asked Otis to formally respond to its directive.

Several days after the meeting, Yates sent a letter to the Airport formally laying out the arguments in favor of Otis' interpretation.[4] Chapman Sisson responded in a letter dated March 29, 2012. It rejected the arguments favoring Otis' interpretation and concluded that Drawing A180 called for 40-inch steps, not 32-inch steps.

On May 7, 2012, Yates reached a compromise with the Airport that was formalized as Change Order 75. Under the agreement, the Airport would keep all four of the 32-inch escalators. The two exterior escalators would remain in place and receive some minor modifications. The two interior escalators would also remain, but would be repositioned so that a third, 40-inch-step escalator could be added. Yates would avoid liability for liquidated damages, but it would have to perform the work at no cost and would credit the Airport $100,000 for accepting the exterior escalators and $36,600 for the architectural and engineering costs of

---

[4] Two versions of Yates' letter were produced at trial. The one dated March 28 presents the arguments as the opinion of both Yates and Otis, while the one dated March 29 specifies that the arguments are Otis' view. The parties disagree about which one was actually sent to Chapman Sisson, but it does not matter to our decision.

reconfiguring the interior escalators. Yates also had to waive its right to recover from the Airport any costs associated with Change Order 75.

On May 9, 2012, Yates and Otis worked out their own agreement for Change Order 75. Each agreed to bear its own costs and reserved its respective rights against the other under the Subcontract. Otis completed the installation and alteration of the escalators within the timeframe specified by Change Order 75. Yates claims that it incurred $599,000 in costs associated with Change Order 75, and it offset those costs by invoking the terms of the Subcontract and withholding the $260,013.70 that it owed Otis for its initial work installing the escalators (not on Change Order 75). Otis claims that its records show that it incurred $123,659.97 in completing the work for Change Order 75.

## B.    PROCEDURAL HISTORY

Otis filed suit against Yates on April 27, 2012. It brought claims for: (1) breach of the Subcontract, (2) fraud, and (3) violation of the Alabama Prompt Pay Act, see Ala. Code § 8-29-1 et seq. Otis sought monetary damages for: (1) the $260,013.70 that Yates withheld from Otis under the Subcontract; (2) the 12% statutory interest on that sum; (3) the $123,659.97 that Otis incurred as cost in performing Change Order 75; and (4) attorney's fees and costs. Yates answered and filed a counterclaim alleging breach of the Subcontract and seeking damages for the costs it incurred under Change Order 75.

10

Yates moved for summary judgment. It argued that the Subcontract unambiguously called for 40-inch escalator steps, and that Otis' failure to seek pre-bid clarification of the ambiguity in Drawing A180 precluded it from now challenging the Airport's reasonable interpretation of the drawing. The district court denied the motion after concluding that the Subcontract was ambiguous. The court did not address Yates' argument about pre-bid clarification.

The district court then held a three-day bench trial. The focus was on the reasonableness of Otis' and Yates' interpretations. Otis contended that Drawing A180 was ambiguous as to the escalators' step width, that the tick marks could reasonably be interpreted as calling for a rated width of 39.5 inches (which would require 32-inch steps), and that Yates' failure to pay Otis for its performance based on that reasonable interpretation was a breach of the Subcontract. Yates argued that Drawing A180 unambiguously called for a 40-inch nominal step width, that Otis' interpretation was unreasonable, and therefore that Otis was the one who had breached the Subcontract. At the close of Otis' case, Yates moved for judgment as a matter of law. The district court directed a verdict against Otis on its fraud claim, but not on its contract claims. Yates then presented its evidence, and the parties made their final arguments to the judge.

The district court issued an opinion granting judgment for Otis on its breach-of-contract claim and denying Yates' counterclaim. The court awarded Otis:

11

(1) the Subcontract balance of $260,013.70, plus 12% interest under the Alabama Prompt Pay Act; and (2) compensatory damages of $123,659.97 for the cost of performing the work for Change Order 75.

## II.    STANDARD OF REVIEW

In an appeal from a bench trial, we review the district court's factual findings for clear error and its legal conclusions de novo.  Renteria-Marin v. Ag-Mart Produce, Inc., 537 F.3d 1321, 1324 (11th Cir. 2008).  The interpretation of a contract is a legal conclusion.  See Allapattah Servs., Inc. v. Exxon Corp., 333 F.3d 1248, 1261 (11th Cir. 2003) ("What a contract provision means, or whether it is ambiguous, are questions of law, which we review de novo.") (quotation marks omitted).

## III.    DISCUSSION

Yates contends that the district court committed six reversible errors.  We can decide this appeal by addressing just two of them.

### A.    Otis' Duty to Clarify

Otis' breach-of-contract claim relies on the premise that Drawing A180 was ambiguous as to whether the project called for 32-inch-step or 40-inch-step escalators, and that Otis had reasonably interpreted the contract by picking one of the two reasonable interpretations and installing 32-inch steps.  See United States v. Spearin, 248 U.S. 132, 136–37, 39 S.Ct. 59, 61 (1918); Robins Maint., Inc. v.

12

United States, 265 F.3d 1254, 1257 (Fed. Cir. 2001) (citing Spearin for the proposition that a contractor may recover "based on inaccurate specifications" if "the contractor was misled by the[] errors in the specifications").  A subcontractor cannot recover based on its reasonable but unilateral resolution of an ambiguity, however, if the subcontractor is subjectively aware of that ambiguity when bidding on the construction contract and fails to clarify that ambiguity by inquiring of the contractor.  See James A. Mann, Inc. v. United States, 535 F.2d 51, 61 (Ct. Cl. 1976) (holding that, where "the alleged ambiguity was known to the plaintiff before it submitted its bid," the "plaintiff was required to seek clarification from the contracting officer"); Blount Bros. Constr. Co. v. United States, 346 F.2d 962, 973 (Ct. Cl. 1965) ("[Subcontractors] are obligated to bring to the Government's attention major discrepancies or errors which they detect in the specifications or drawings, or else fail to do so at their peril.").[5]  Otis failed to do that in this case and must suffer the peril.

Trey Steber, the Otis employee who prepared its bid on the escalator project, testified at his deposition (which was admitted into evidence at the bench trial) that

---

[5] The Blount Brothers and James A. Mann decisions are part of the so-called Spearin doctrine.  See 3 Bruner and O'Connor on Construction Law §§ 9:64, 9:78 (2014), available at Westlaw Bruner & O'Connor Construction Law.  Alabama courts have adopted Spearin's approach to implied warranties in construction contracts.  See Broyles v. Brown Eng'g Co., 151 So. 2d 767, 772 (Ala. 1963) (endorsing Spearin).  We therefore apply Spearin's progeny here. See State Farm Mut. Auto. Ins. Co. v. Duckworth, 648 F.3d 1216, 1224 (11th Cir. 2011) (explaining that, in diversity cases where the forum state's supreme court has not spoken directly on an issue, "we must anticipate how the [state] [s]upreme [c]ourt would decide th[e] case").

13

he noticed the step-width dimensions were "unclear" when he was preparing Otis'

bid.  So there is no question that Otis was subjectively aware of the ambiguity in

Drawing A180.  Furthermore, nothing in the record indicates that Steber or another

Otis employee asked Chapman Sisson or Yates to clarify the meaning of the 39.5-

inch measurements in Drawing A180.  If Steber had, he could have testified to it.

Otis points to Steber's testimony that he called Chapman Sisson "to discuss the

escalators" before Otis submitted its bid.  But Steber's testimony shows that the

only detail discussed during that call was "how many people per hour [the

escalators] needed to move."  When questioned by Yates' attorney, Steber

confirmed that he "did not discuss dimensions with the architect," nor did he

specifically ask Chapman Sisson about step width or what Drawing A180's tick

marks were supposed to indicate.  Under Blount Brothers, Otis had a duty to ask

specific questions about what step width was called for in Drawing A180 because

that was the ambiguity that its employee noticed before submitting Otis' bid.[6]  See

346 F.2d at 973.  Otis' failure to ask for a clarification means that it bore the risk

that Yates would adopt a different, reasonable interpretation.  And Yates' different

---

[6] Because Steber was authorized to prepare Otis' bid, his knowledge of the ambiguity is imputed to Otis.  See Stone v. Mellon Mortg. Co., 771 So. 2d 451, 457 (Ala. 2000) ("An agent's knowledge can bind the principal if the agent acquired the knowledge while acting within the line and scope of his authority and the knowledge relates to the very matter coming within his authority.").

14

interpretation was reasonable.  For this reason, the district court erred in granting judgment to Otis instead of Yates on that claim.  There is also another reason.

## B.    Effect of the Architect's Decision

The Subcontract between Yates and Otis contains a mechanism for resolving disputes about the Subcontract's terms.  It provides that:  "If there is . . . a difference in interpretation, the matter shall be referred to the appropriate design professional whose decision the Subcontractor shall implement at no additional cost."  Alabama courts have long recognized the right of parties to designate a third-party expert, such as an architect, to resolve later disputes over ambiguities in the contract.  Finish Line v. J.F. Pate & Assocs. Contractors, Inc., 90 So. 3d 749, 758–59 (Ala. Civ. App. 2012).

At trial, Yates argued that Chapman Sisson was "the appropriate design professional" because it designed the airport expansion.  Yates asserted that Chapman Sisson had issued its "decision" in its letter dated March 29, 2012.  That letter rejected the arguments presented in favor of Otis' reading and concluded that Drawing A180 called for a 40-inch step width.  As a result, Yates argued, the Subcontract required a 40-inch step width.

The district court rejected that argument.  Initially, the court suggested that Chapman Sisson was not "the appropriate design professional" referred to in the Subcontract.  The court thought that reference was "ambiguous at best" because

15

the term "'[a]ppropriate design professional' is not defined by the contract" and "could as easily refer to a neutral arbitrator or an escalator consultant as to Chapman Sisson." The court went on to conclude that, even if Chapman Sisson were "the appropriate design professional," its decision was not binding because it "constituted an arbitrary action and a failure to exercise honest judgment." The court based that conclusion on the fact that Chapman Sisson had made numerous visits to the project site and reviewed Otis' bid for the escalator project, yet it did not raise any issue with the 32-inch steps until the Airport objected.

In our view, the term "appropriate design professional" is not ambiguous. The Subcontract provides that "[t]he Subcontractor shall be bound . . . by all terms and conditions of the Prime Contract," and that "[a]ll provisions of this Subcontract and . . . the Prime Contract . . . shall be construed together and harmonized." The Prime Contract states that the architect "shall decide all questions that may arise as to the interpretation and/or clarification of the specifications or plans relating to the work." Though the Prime Contract uses the term "the Engineer" in that section, its definitions section makes clear that the term "may be used alternatively with the term 'Architect.'" So Chapman Sisson is "the appropriate design professional" that the Subcontract vests with binding authority to resolve ambiguities.

16

We also disagree with the district court's conclusion that Chapman Sisson's interpretation was not binding. Under Alabama law, the third-party expert's decision "can be impeached only for fraud, or such gross mistakes as would imply bad faith or a failure to exercise an honest judgment." Finish Line, 90 So. 3d at 759 (quotation marks omitted). That is a high bar, and justifiably so. If the bar were lower, third-party-expert interpretations would lack the finality they are meant to provide. See id. Here, Chapman Sisson's interpretation did not amount to fraud or such a gross mistake as to imply bad faith or a failure to exercise honest judgment. As the district court's decision and Otis' brief acknowledge, Drawing A180 is ambiguous as to whether it calls for 32-inch or 40-inch escalator steps — which means that it can be reasonably interpreted as calling for 40-inch escalator steps.[7] See Mann v. GTE Mobilnet of Birmingham Inc., 730 So. 2d 150, 155 (Ala. 1999) (explaining that a contract term is ambiguous where it "is susceptible to more than one reasonable interpretation"). Because a reasonable interpretation is

---

[7] There is no support in the record for the district court's assertion that "[k]nowledge of Otis' intent to supply escalators with a 32 inch step width [can be] imputed to the Architect by its approval of Otis' specifications and by allowing Otis to substantially complete installation of the escalators before alleging that the same failed to comply with the contract documents." The testimony at trial from Chapman Sisson was clear and uncontradicted that its approval of Otis' shop drawings — per industry custom — did not include a review or an endorsement of the dimensions in those drawings. And the Subcontract clearly states that Yates' and Chapman Sisson's reviews of Otis' shop drawings "shall not relieve [Otis] from responsibility or liability for any mistakes, error, or deviation, or of [Otis'] obligation to perform its work in strict accordance with the Prime Contract." Finally, the district court reads too much into the delay between the bid and the first time the mistake was recognized. Chapman Sisson recognized the mistake the first time that its employee (Waters) rode the escalators. Nothing in the record suggests that it was aware of, or knowingly accepted, the 32-inch escalator steps before Waters noticed the problem.

17

not a fraud or gross mistake, the district court should not have set aside the third-party expert's binding interpretation.[8] See Finish Line, 90 So. 3d at 759.

Otis makes two additional arguments as to why Chapman Sisson's letter was not binding, but neither has any support in the language of the contracts or the law of Alabama.  First, Otis points out that Yates' letter summarizing the arguments in favor of the 32-inch-step interpretation (sent on either March 28 or 29) was not addressed to Chapman Sisson and did not specifically request an official, binding interpretation from Chapman Sisson.  True, but nothing in the language of the Subcontract or the Prime Contract says that such a formal invocation is required. The Prime Contract simply says that the architect "shall decide all questions that may arise as to the interpretation and/or clarification of the specifications or plans relating to the work."  Just such a question arose at the meeting on March 26 between the Airport, Chapman Sisson, Yates, and Otis.  So Chapman Sisson had authority to settle it.

Second, Otis argues that Chapman Sisson's letter should not be binding because neither Yates nor Otis treated it as binding while they were still working

---

[8] The district court seemed to be under the misimpression that Chapman Sisson had to accept Otis' interpretation so long as there was a case to be made that Otis' interpretation was reasonable.  That is not what the Subcontract or the Prime Contract said.  They gave Chapman Sisson the authority to resolve differences of interpretation.  They did not require it to resolve every dispute in favor of the subcontractor if that subcontractor's reading was reasonable any more than they required that it decide every dispute in favor of the contractor if the contractor's interpretation was reasonable.  Chapman Sisson was to decide between two reasonable interpretations, and it did.

18

on the expansion project.  There is no provision either in the contracts or in any decision by any Alabama court suggesting that their reaction to the letter makes any difference.

III.

We reverse the part of the judgment for Otis on its breach-of-contract claim and remand with direction that judgment be entered for Yates on that claim.  We vacate the judgment against Yates on its counterclaim and remand for further consideration in light of this decision.

**REVERSED and REMANDED for further proceedings consistent with this opinion.**