**BLOUNT BROTHERS CONSTRUCTION COMPANY**
**v.**
**The UNITED STATES.**
No. 443–60.

United States Court of Claims.
June 11, 1965.

John T. Koehler, Washington, D. C., for plaintiff. Butler, Koehler & Tausig, Washington, D. C., of counsel.

Frances L. Nunn, Washington, D. C., with whom was Asst. Atty. Gen., John W. Douglas, for defendant. John G. Roberts, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

PER CURIAM.

This is a contract case presented to this court on the record made before the Armed Services Board of Contract Appeals. The case was initially referred to Trial Commissioner C. Murray Bernhardt, who recommended that the plaintiff recover. The parties have submitted further briefs and oral argument has been had before the court. The court agrees with the commissioner that the contractor is correct in its interpretation of the contract. The court also rejects certain defenses, not going to the merits, which the Government has raised. We hold, therefore, that plaintiff is entitled to recover and that the amount of recovery should be determined under Rule 47(c).

I.

The issue is whether specifications and drawings incorporated in the plaintiff's 1956 Navy contract for building the David Taylor Model Basin at Carderock, Maryland, required the bottom concrete slab of the 322′ x 202′ maneuvering basin to rest completely on concrete fill and/or natural rock; or whether portions of the slab were reasonably inferred to rest on soil. The rock line actually encountered was found to lie substantially lower than the levels interpolated by the Government from its core borings. We are not concerned with the concrete fill poured by plaintiff's subcontractor under a change order to bring the actual rock line up to the levels erroneously plotted by the Government from its core borings, for this was performed and paid for as an extra. We are concerned with the concrete fill installed by the plaintiff at the Government's direction to replace some 3,146 cubic yards of excavated muck and sand separating the hypothetical subsurface rock line erroneously diagrammed in the Government drawings, and the concrete slab prescribed by the drawings.

In the course of performance, disputes arose as to whether the contract plans and specifications required the plaintiff to (a) encase a number of concrete buttress footings in rock and/or concrete fill, and (b) replace with concrete fill all soil excavated between the theoretical rock line and the bottom of the maneuvering basin slab. In March 1957 the contracting officer ruled against the plaintiff on both disputes. His ruling on the latter dispute was as follows:

> After a full review of the facts presented, the Contracting Officer determines that no conflict is apparent between the contract drawings and specification and further that

the drawings clearly indicate that the Basin slab must rest directly on rock, or on lean concrete where the elevation of the rock is lower than the bottom of the slab. Therefore, the position taken by you, that you are not required to provide concrete fill, other than in areas where over excavation of rock has occurred, is considered untenable.

Accordingly, and for the foregoing reason, your claim in the amount of $99,099.00 is hereby denied. This is a final decision of the Contracting Officer.

The plaintiff appealed both adverse decisions to the Armed Services Board of Contract Appeals, which held a hearing. On June 11, 1959, the Board sustained plaintiff's appeal relating to the buttress footings,[1] and denied the other claim for concrete fill under the maneuvering basin slab, whereupon the plaintiff filed its present petition.

▮ The issue before us is one of law—whether the specifications and drawings required concrete fill in those areas in which the Board denied the plaintiff's claim. The Board dealt with this question as one of law, and in the main rested its decision on its view of the terms of the contract and the requirements of the drawings, not on disputed issues of fact. Since the question of contract interpretation is one of law, we are not bound by the Board's understanding of the contractual obligations, but may decide the matter for ourselves. 41 U.S.C. § 322; C. J. Langenfelder & Son, Inc. v. United States, Ct.Cl., 341 F.2d 600, 609, decided Feb. 19, 1965;

Kaiser Industries Corp. v. United States, Ct.Cl., 340 F.2d 322, 333–334, decided Jan. 22, 1965.[2] As will appear from Part III of this opinion, infra, only one aspect of the Board's opinion which is significant to the resolution of the legal question can be characterized as a determination of a disputed factual issue, i. e. a symbol for concrete on the drawings. To the extent the Board relied on its finding on that point, its decision is unsupported by substantial evidence and must be rejected. The other factual findings of the Board are accepted; the court is not substituting its own view of the facts. See Morrison-Knudsen Co. v. United States, Ct.Cl., 345 F.2d 833, decided May 14, 1965. We decide the legal issue on the basis of the Board's factual findings—except for the one finding, already mentioned, which we hold not to be adequately supported—and on the basis of those facts conclusively shown by the Board record.[3] These facts are found in the commissioner's opinion, as approved by the court. Accordingly, there is no occasion to remand the case to the trial commissioner as defendant asks. The court can decide the legal issue and thus dispose of the case, at the present stage.[4]

## II.

▮ Defendant urges that the plaintiff, the prime contractor, is barred by the doctrine of Severin v. United States, 99 Ct.Cl. 435, 442–444 (1943), cert. denied, 322 U.S. 733, 64 S.Ct. 1045, 88 L.Ed. 1567 (1944), from recovering on behalf of its subcontractor (Whittington & Brown Co., Inc.) which actually did the work. The argument is that the subcontract exculpated the plaintiff from all

1. This dispute also involved alleged ambiguity in the specifications and drawings.

2. In this court both parties have declined to produce any evidence in addition to that produced before the Board.

3. The Board did not rely on oral testimony as to the witnesses' understanding of the meaning of contract drawings or specifications, but we point out, in any event, that such testimony (aside from issues of trade or professional practice, the

actual practice of the parties, and the like) cannot properly be characterized as "factual" under the Wunderlich Act.

4. Initially, defendant did not present to the court any argument on the substantive issue of the meaning of the specifications and drawings, but at the court's request both parties submitted, after the oral argument, written arguments on that issue. The defendant has had ample opportunity to put forward its position on that matter.

liability on this score. We hold, however, that the Government has failed to show that there was any pertinent exculpatory clause in the subcontract. That agreement provided that the "Contractor shall not be liable to the Sub-Contractor for delay to Sub-Contractor's work by the act, neglect or default of the Owner [i. e., the Government], * * *" (Article III (d)).[5] But plaintiff does not seek in this action to recover delay damages; this suit is solely for an equitable adjustment for the additional expense incurred as a result of an alleged change ordered by the contracting officer. The subcontract does not embody any exculpatory clause relating to such adjustments for additional work ordered by the contracting officer but not compensated for by the defendant because believed to be within the original terms of the contract. Article IV deals with compensation for admitted changes ordered by the defendant and accepted by the prime, but the article contains no express exculpatory clause at all,[6] and certainly there is nothing in it absolving the prime from liability for extra work (performed by the subcontractor) on which the Government insists but for which it refuses any compensation. To come under the "Severin" doctrine the defendant must show, through some contractual term or a release, that the plaintiff-prime is not liable to the subcontractor. "[I]f the subcontract is silent as to the ultimate liability of the prime contractor to the subcontractor for the damages complained of, suit by the former against the Government on behalf of the subcontractor will generally be permitted." J. L. Simmons Co. v. United States, 304 F.2d 886, 889, 158 Ct.Cl. 393, 398 (1962). There is no release in this case, and the subcontract is silent as to the plaintiff's ultimate liability to Whittington & Brown Co., Inc., on the claim involved here.[7] There is therefore no bar to this suit by the plaintiff.

### III.

On the merits, we adopt, with some modifications, the trial commissioner's discussion, which follows (as changed by the court):

It was known that at the site selected for the huge rectangular maneuvering basin the natural rock was at or near the surface. Rock elevations were plotted by the Government from a series of core borings. The theoretical rock line thus plotted by the Government was shown in contract drawings to lie above the 108′ elevation established for the bottom of the basin for roughly half of its length, and below it for the remainder. In the course of clearing the site and leveling it off to the required elevation it was discovered that the actual rock formation was substantially lower than the theoretical rock line shown by the drawings. Since paragraph 2–01 of the speci-

5. The full clause reads as follows: "Contractor shall not be liable to the Sub-Contractor for delay to Sub-Contractor's work by the act, neglect or default of the Owner, or the Architect, or by reason of fire or other casualty, or on account of riots or of strikes, or other combined action of the workmen or others, or on account of any acts of God, or any other cause, beyond the Contractor's control; but Contractor will cooperate with Sub-Contractor to enforce any just claim against the Owner or Architect for delay."

6. This court has held that a prime contractor may sue even though the prime "has agreed to reimburse its subcontractor for damages it has suffered at the hands of the Government, but only as and when the former receives payment for them from the Government." J. L. Simmons Co. v. United States, 304 F.2d 886, 889, 158 Ct.Cl. 393, 398 (1962).

7. At one point in its papers before the trial commissioner, plaintiff stated that "the burden of extra costs fell upon Whittington & Brown Co., Inc., the concrete subcontractor, and not on Blount Brothers Construction Company, the prime contractor." We do not read this unguarded comment as a true concession of nonliability on the part of plaintiff, but rather as a reference to the conceded fact that the initial and direct impact of the allegedly extra costs fell upon the subcontractor. Plaintiff's counsel has since disavowed the statement if it means anything more.

fications provided that bids should be estimated on the basis of rock and other materials existing at the locations indicated in the contract documents, the plaintiff was issued a change order compensating it for pouring concrete on top of the actual rock to bring it up to the theoretical rock line wherever it was lower than the construction line of the basin (i. e., the 107.33′ elevation of the bottom of the 8″ concrete slab forming the floor of the basin, the top of the slab being 108′). In those areas where the theoretical rock line was lower than the construction line (107.33′) the Government required plaintiff at its expense to excavate 3,146 cubic yards of muck and sand separating the theoretical rock line from the construction line and to fill the void thus created with concrete fill. The net effect of the change order plus the additional 3,146 yards of concrete fill was to position the floor slab of the maneuvering basin on rock and/or concrete throughout its entire expanse, although the specifications contained no clearly expressed requirement to that effect. The Government concedes that the specifications contained no requirement that soil lying below the construction line of the slab be replaced with concrete, but reads this requirement from the contract drawings and, therefore, holds it to be binding on the plaintiff because General Provision 2(2) of the contract provides that:

 * * * Anything mentioned in the specifications and drawings, *or shown on the drawings and not mentioned in the specifications,* shall be of like effect as if shown or mentioned in both. (Emphasis supplied.)

The plaintiff says that the drawings do not show this requirement, and that if they are so interpreted they are not binding on the contractor because the interpretation would conflict with specification 2–03(e) and, under General Provision 2(a) of the contract, "In case of difference between drawings and specifications, the specifications shall govern".

Major controversy centers on specification 2–03(e), reading as follows:

2–03. *Excavation.—*  *  *  *
 *  *  *  *  *

(e) *Over excavation,* below the structures shown as resting on rock, shall be filled with concrete. Where backfill in rock is shown or specified to be concrete, the extent of such concrete work specified under concrete specifications shall be determined by the limits of rock excavation and will be made at the contractor's expense unless he is specifically directed to extend excavations beyond the limits shown or specified. Over excavation below any structure resting on soil shall be filled to proper grade with compacted soil as hereinafter specified, all at contractor's expense unless over excavation is specifically directed.

As an aid to construction, specification 1–12 provides:

*Definitions.*—Where "as shown", "as indicated", "as detailed", or words of similar import are used, it shall be understood that reference to the drawings accompanying this specification is made unless stated otherwise. * * *.

Specification 2–03(e) supra, contains three sentences. The first sentence relates to rock overexcavation in those areas where the drawings show particular parts of the maneuvering basin to rest on rock, and the natural rock is higher than the contract elevation of the structure. In such cases it is necessary to cut the rock down to the construction elevation. Should the contractor excavate the rock to less than the construction elevation (and rock cannot be excavated exactly to line) it is his responsibility to fill it with concrete precisely to the construction line so that the structure will bed on rock and/or concrete at these points. There is no controversy as to this sentence. The second sentence of specification 2–03(e) concerns overexca-

vation in rock in connection with wall footings and foundations. In excavating into rock for the forming and pouring of footings and foundations it is impossible to cut the rock precisely to the dimensions required. For example, in digging a vertical trench for a footing the rock is cut on a steep slope instead of straight down and, when the footing is formed and poured, the space between the footing and the rock face is required to be filled with concrete in order to enhance structural stability. Numerous drawings show this structural detail, and in each case the concrete fill is indicated by an appropriate symbol and almost always by words as well. There is no problem as to the meaning of the second sentence.

The issue resides in the third sentence of specification 2–03(e), viz:

> * * * Over excavation below any structure resting on soil shall be filled to proper grade with compacted soil * * *.

To the plaintiff the simple meaning of this third sentence of specification 2–03 (e) was that any part of the structure situated where soil existed on the natural state of the site would rest on soil unless the drawings indicated it was to rest on something else. When the drawings did not so indicate the plaintiff deemed the contractor's sole responsibility was to level off the soil to the required elevation or, should he inadvertently overexcavate the soil, then to fill the overexcavated areas back up to the required elevation with compacted soil.

It is true that unlike the first two sentences of specification 2–03(e), the third sentence lacks such qualifying words as "as shown", "as indicated", "as detailed", or words of similar import to clearly import the accompanying drawings. However, it is necessarily implied that the use of compacted soil to backfill overexcavated areas below structures *shown by the plans* to rest on soil is intended. Moreover, the phrase "structure resting on soil" means the condition shown by the plans to be ultimately accomplished at the completion of construction, and does not mean

"structure resting where soil originally was". No other interpretation of the language would be sensible, but as expressed it does contain the potential for being misunderstood.

The distinction is illustrated by drawing 732,433, which shows a cross-section elevation view across the width of the basin at a point approximately halfway down the length. About 125′ of the concrete basin slab is shown in this cross-section. The top of the theoretical rock elevation is shown about 3′ below the slab. The space between the rock and the slab is shown by symbol and words to be filled with concrete fill. Presumably the designers deemed that soil intervened between the slab elevation and what they thought was the rock elevation, so that had the area merely been graded to the construction line and the concrete slab then poured, it would have rested on soil and not on rock, save for the direction in the drawing.

It seems, in retrospect, that in phrasing the third sentence of specification 2–03(e) the draftsmen had in mind certain structures in the maneuvering basin complex shown in the plans to rest on soil, particularly the "beach". The so-called beach is an inclined slab of concrete about 36′ in width which extends down the whole length on one side of the basin and is contiguous to a trough about 15′ deep which separates the beach from the concrete slab constituting the major part of the basin floor at an elevation of 108′. The drawings specify a compacted earth fill underneath the beach slab. And other drawing details depicting various aspects of the *basement* floor (usually at an elevation of 113′) show a substructure of crushed stone or gravel fill on top of earth which in turn is on top of rock. The purpose of this diversion is to show that the authors of the third sentence of specification 2–03(e) probably had in mind structures such as the beach slab when they referred to structures resting on soil, but did not appreciate the problem which might arise in applying this isolated language to areas of the basin slab where rock was encountered at an eleva-

tion lower than the construction elevation and soil was sandwiched in between.

As it was, the entire body of rock actually encountered lay substantially lower than the theoretical or anticipated rock levels, and this accentuated the ambiguity of the specification, for there turned out to be a much larger area occupied by soil than by rock at the construction elevation of the basin slab. The plaintiff understood the third sentence of specification 2–03(e) to apply to every area where soil instead of rock lay at the elevation required for the basin slab (i. e., 107.33′), although we now may suspect that the authors primarily had in mind the soil under the beach slab.

Where specifications can and should but do not expressly provide for a desired condition in the end product such omission increases the duty of the drawings to be clear and free from ambiguity in portraying the condition. Silent specifications coupled with imperfect drawings create an ideal climate for confusion. A few simple words in the specifications, or the correction (in this case) of drawing 732,398 would have been a beacon to the plaintiff as to what was wanted for the basin slab to rest on and would have avoided this lawsuit. But without these small improvements the plaintiff was unclear as to requirements, and the clues which the defendant says the contract documents contained were not so crystal clear as to overcome the doubt. We shall now consult the drawings.

In the course of the Board hearing a total of 13 separate contract drawings were specifically referred to and discussed out of a total of 264 drawings covering the entire prime contract segregated into the work classifications of Civil, Architectural, Building Structural, Building Mechanical, Electrical, Instrumental, Facility Mechanical, Maneuvering Bridge, Rotating Arm, and Dry-Dock. Information as to the substructure material required under the maneuvering basin slab would logically appear in the group of 57 drawings comprising the work classification "Building Structural", for this group related to such items as foundations, concrete work, walls, basin elevations, etc. In fact, 10 of the 13 drawings used by the Board were from the "Building Structural" group of 57 drawings.

Of the 10 drawings only two (drawings 732,398 and 732,433) presented elevation views of the entire length or width of the maneuvering basin in such a way as to provide the best opportunity for depicting clearly the type of material required under the basin slab. Drawing 732,398, entitled "Maneuvering Basin Interial Wall Elevations", contains six separate "Sections" or drawings showing different aspects of the interior wall elevations of the maneuvering basin. One of these, Section 22–22, is an elevation, or side view of the entire length of the basin slab, showing by a broken line the approximate rock elevation which was depicted as starting substantially below the basin slab elevation at one end of the basin and rising to a point substantially higher than the basin slab elevation at the opposite end. The gradually rising rock elevation is shown intersecting and rising above the basin slab about halfway down the length of the basin. Although a symbol of rock is shown underneath the broken line, no symbol of any kind is shown in the area on the left half of the drawing between the approximate rock elevation and the slab elevation above it. The plaintiff contends, and the defendant's principal witness conceded, that in the absence of any symbol a reasonable interpretation would be that the concrete slab in that area was resting on earth. If there were no other drawings or instructions to go by, the plaintiff's interpretation of Section 22–22 of drawing 732,398 would be reasonable and the plaintiff would have been fully justified in concluding that those portions of the basin slab lying higher than the rock elevations were designed to rest on soil, and not on concrete fill. It is true that 732,398 is the only drawing which shows, either actually or by necessary inference, that the slab is to rest in certain areas on soil. At the same time there is no drawing except one (No. 732,433) which

shows without serious dispute a requirement that overexcavation in *soil* (as opposed to rock) under the basin slab be replaced with concrete fill.

Drawing 732,433, upon which the defendant principally relies, shows something different from drawing 732,398. This drawing, entitled "Rotating Arm and Maneuvering Basin Typical Cross Sections", contains three separate "Sections" or drawings of different aspects of the subject. Section 39–39 purports to be an elevation or side cross-section of the width of the basin and superstructure taken at a point approximately equidistant from the ends of the entire basin. It shows the approximate subsurface top of rock lying about 3′ below the basin slab, and the intervening space is designated by the symbol for lean concrete fill, in addition to wording to that effect. The plaintiff argues that this merely reflected the admitted specification requirement that whenever rock was encountered at an elevation higher than the elevation of the concrete basin slab, if in excavating the rock to the construction line there were any areas inadvertently overexcavated below that line then the overexcavated areas of rock had to be filled up with concrete fill and leveled off up to the elevation of the bottom of the 8″ concrete basin slab, all at the contractor's expense. This is not a plausible construction of the intention of Section 39–39 of drawing 732,433, because an accurate recalculation of the theoretical rock line interpolated from the rock boring data demonstrated that the theoretical rock elevation at the midpoint of the basin in question was lower at all points than the bottom of the basin slab. If there were no other drawing or instructions to go by, particularly if drawing 732,398, supra, had not been included in the drawings, then it would be reasonable to conclude that at the midpoint of the basin depicted in Section 39–39 of drawing 732,433, *or at any other cross-section of the basin where a comparable condition existed as typified by drawing 732,433* (i.e., rock lying lower than the basin slab), the contractor would be required at its expense to add concrete fill on top of the rock line to bring it up to the level of the concrete basin slab, so that the slab would rest on rock and/or concrete fill throughout. The plaintiff contends that drawing 732,433 was merely a "schematic diagram", which was of no use in estimating quantities and of no particular significance to the contractor's responsibility to build the basin in accordance with drawings, but there is no merit seen to this argument. Regardless of the manner or style in which the language of a contract conveys its intention, and whether it appears in the drawings or the specifications or in some other authorized place in the contract documents, if it serves to explain clearly what the contract requires and if its message is not refuted or contradicted by some opposite instruction of equal authority, then the label given it is of no importance.

The parties point to other drawings. The defendant says that drawing 732,546, which purports to be a "General Plan and Elevation" of the bridge across the maneuvering basin, also shows that concrete fill is required to fill the gap between a low rock line and the higher slab elevation. This drawing shows collaterally an elevation view along the length of the basin, with a rock line lying somewhat lower than the basin slab for about half the basin's length. The space between the rock line and the basin slab is filled with dots which the defendant contends (and the Board erroneously found) represent concrete fill. A material schedule in drawing 732,361 lists a series of symbols for various materials, such as concrete, earth, crushed stone, etc.[8] The symbol for concrete is repre-

---

8. There is no symbol listed for rock. The symbol given for earth is used throughout the drawings to indicate rock. The symbol used in the drawings to indicate earth is not found in the Material Schedule at all. These are minor imperfections which presented only momentary difficulty in interpreting the drawings. But they are an indication that mistakes can and did occur in the drawings.

sented by a sprinkling of dots interspersed with small triangles. None of the symbols presented in the material schedule consists of a series of dots alone, such as the dots referred to in drawing 732,546 above. It may be that such dots are a "conventional" symbol for concrete, as the Board found, but if this is so it appears nowhere in the record and it is not a matter of such common knowledge that it may be judicially noticed by this court. There is no substantial support in this record for the conclusion that concrete is represented by such dots alone. So far as drawing 732,546 is concerned no conclusion can be drawn by a bidder as to the type of material required to build the rock line up to the elevation of the basin slab. But it might be enough to raise a question in the mind of an alert bidder if he had time, curiosity, and opportunity to make inquiry. On the other hand it was negligent for the Government to submit for bidding purposes a drawing which is so ambiguous and misleading.

A great deal of testimony was given on drawings 732,380 and 732,381, which purport to show collectively some 18 different aspects of problems involved in "Concrete Sections and Details". The defendant derives a modicum of support for its contentions from three of the 18 "sections" which show short sections (2½' to 3') of the basin slab overlying rock with the space between the rock and the bottom of the basin slab being filled with what is clearly marked (with words and appropriate symbols) as concrete fill. The short projections of the basin slab thus shown are depicted as small portions or details of much more elaborate section drawings.[9] Without substantially more to support them in the other drawings and/or specifications, it would not be reasonable for a bidder to conclude that the substructure of concrete fill shown underlying these short sections of basin slab was a direction that the entire 322' length and 202' width

of the basin should be so composed wherever the rock lay lower than the slab. These may be clues, but they are not clear representations of a larger intention. If this kind of shorthand expression is standard practice for architect engineers, so that such minute details have a universal understanding in the profession, that fact was not stated by the experts who testified for either side. The plaintiff's witness explained that the short projections in question were to indicate additional support for the basin walls around the pool perimeter. This explanation is no more satisfying than the defendant's.

In all the other details in drawings 732,380 and 732,381, where concrete fill is shown it is shown as providing lateral support for walls and foundations.[10] In other words, both the specifications and the drawings require that, when rock is overexcavated in order to insert a wall footing or foundation, the space between the wall or footing and the face of the adjacent overexcavated rock is to be filled with concrete in order to stabilize the wall or footing. The concrete fill is to be poured up to the level of the adjacent rock, so that the end result will be that the wall or footing will be firmly held in an unyielding material just as though in some impossible way the rock had been tailored to exactly fit the dimensions of the wall foundation or footing. Of course, as said before, rock cannot be cut or blasted with anything like that precision, and so the requirement of concrete fill to compensate for the overexcavation is readily understandable. About the only useful thing that the drawings in question establish that is relevant to the issues under consideration is that the drawings are generous in showing the requirement for concrete fill in a great many situations, while they are parsimonious in the same degree when it comes to clearly showing concrete fill underneath *all* parts of the basin slab not resting on rock.

---

9. The same problem is shown in Section 18–18 of drawing 732,382, and in Sections 29–29 and 31–31 of drawing 732,-383.

10. Also shown in numerous other drawings, such as 732,382 and 732,383, and 732,-384.

Drawings 732,380 and 732,381 also show several elevation views of the basement floors in various parts of the total structure. The basement floors generally have an elevation of 113' as compared with the 108' elevation of the basin slab where our issue centers. However, it may be significant that in each case the basement floors are shown to rest on "crushed stone or gravel fill" instead of the concrete fill which the defendant contends was required for the basin slab. It may be that the basin slab required a more unyielding, firm, rock-like substructure support than the basement floors, but if this was a design function in the minds of the Government draftsmen, it does not appear to have been communicated to the plaintiff, so far as the record discloses.

In the same vein, the Government contends that it was imperative that the basin slab rest throughout on rock and/or concrete, and at no place on soil, because the stresses to which the floor was designed to be put (20' or more of water violently agitated by various testing procedures) would otherwise cause the danger of "differential settlement" whereever the slab sat on mere soil. The difficulty with this argument is that the intention in the minds of the Government's designers as to the contemplated stresses on the basin slab is of no consequence to bidders unless communicated to them, and this was not shown to have been done. Of course, in calm retrospect, now that we have the advantage of hindsight, it would readily occur to us to wonder why the plaintiff would not question the need for concrete fill underneath certain portions of the slab where surface rock was overexcavated, while soil was presumably adequate to support other portions of the slab where the rock was lower than the slab elevation. But in the course of estimating on a contract for almost $10,000,000 involving 264 large drawings and about ten pounds of specifications, it is easily conceivable that the fine points involving $100,000 worth of concrete fill, questionably presented in the drawings and unmentioned entirely

in the specifications, might justifiably escape notice.

Drawing 732,377, under "General Concrete Notes", specifies the class and type of concrete in a list of various structures, one of them being "Fill under basin slabs". This cannot be enlarged into the broad meaning contended by the Government, that the entire slab was thereby indicated to rest on concrete and/or rock. The specifications clearly required that where rock was to be excavated down to the required elevation for pouring the basin slab, any overexcavation was to be compensated by installing concrete fill up to the underneath elevation of the slab. Thus, in the plaintiff's mind, the concrete note as to "fill under basin slabs" logically could have connoted a concrete fill requirement only in those places where there was overexcavation in rock in preparation for pouring the slabs.

Finally, the plaintiff employs drawing 732,404, a plan view of the entire basin, to validate its contention that concrete fill is not always shown on the drawings where its use is intended. The drawing in question shows the perimeter wall of the pool surrounded by an irregular line of rock. It is apparently intended to denote that in excavating trenches in rock to accommodate walls and foundations it is not possible to slice the rock cleanly in a vertical line, but instead it is unavoidable to remove the rock in an irregular steep slope down to the desired depth. The specifications require that such overexcavations in rock be filled with concrete between the excavated rock face and the adjacent structure. It would thus not be necessary to reflect the concrete fill in the drawing, even though so doing would serve as a double insurance and reminder. At any rate the absence of a concrete fill symbol in drawing 732,404 lends no support to the plaintiff's contention as to the effect of a similar omission in drawing 732,398, nor does it weaken it.

■■ From the foregoing discussion of the specifications and drawings we are led directly to the governing case law, which is expressed in the following quo-

tation from WPC Enterprises, Incorporated v. United States, 323 F.2d 874, 876–877, 163 Ct.Cl. 1, 6–7:

\* \* \* Both plaintiff's and defendant's interpretations lie within the zone of reasonableness; neither appears to rest on an obvious error in drafting, a gross discrepancy, or an inadvertent but glaring gap; the arguments, rather, are quite closely in balance. It is precisely to this type of contract that this court has applied the rule that if some substantive provision of a government-drawn agreement is fairly susceptible of a certain construction and the contractor actually and reasonably so construes it, in the course of bidding or performance, that is the interpretation which will be adopted —unless the parties' intention is otherwise affirmatively revealed. Peter Kiewit Sons' Co. v. United States, 109 Ct.Cl. 390, 418 (1947); First-Citizens Bank & Trust Co. v. United States, 76 F.Supp. 250, 266, 110 Ct.Cl. 280, 310 (1948); Western Contracting Corp. v. United States, 144 Ct.Cl. 318, 326 (1958); W. H. Edwards Eng'r Corp. v. United States [161 Ct.Cl. 322, 331–332 (1963)]; Freedman v. United States, 320 F.2d 359, 365 [162 Ct.Cl. 390, 400 (1963)]. This rule is fair both to the drafters and to those who are required to accept or reject the contract as proffered, without haggling. Although the potential contractor may have some duty to inquire about a major patent discrepancy, or obvious omission, or a drastic conflict in provisions (see Consolidated Eng'r Co. v. United States, 98 Ct.Cl. 256, 280 (1943); Ring Constr. Corp. v. United States, 162 F.Supp. 190, 192, 142 Ct.Cl. 731, 734 (1958); Jefferson Constr. Co. v. United States, 151 Ct.Cl. 75, 89–91 (1960)), he is not normally required (absent a clear warning in the contract) to seek clarification of any and all ambiguities, doubts, or possible differences in interpretation. The Government, as the author, has to shoulder the major task of seeing that within the zone of reasonableness the words of the agreement communicate the proper notions—as well as the main risk of a failure to carry that responsibility. If the defendant chafes under the continued application of this check, it can obtain a looser rein by a more meticulous writing of its contracts and especially of the specifications. Or it can shift the burden of ambiguity (to some extent) by inserting provisions in the contract clearly calling upon possible contractors aware of a problem-in-interpretation to seek an explanation before bidding. See Beacon Constr. Co. of Mass. v. United States, 314 F.2d 501, 504 [161 Ct. Cl. 1, 6–7 (1963)]; Guyler v. United States, 314 F.2d 506, 510–511 [161 Ct.Cl. 159, 168 (1963)] (concurring opinion).

See, also, Kings Electronics Co. v. United States, Ct.Cl., 341 F.2d 632 decided Feb. 19, 1965.

The question of the contractor's duty to inquire as to ambiguities in specifications and drawings was present in both the WPC Enterprises and the Beacon Construction cases, supra. In the former no such duty was found to exist in the absence of a "major patent discrepancy, or obvious omission, or a drastic conflict in provisions", while in the latter case the circumstances were such as to impose a duty to inquire because "the discrepancy was in actual fact, and in reason must have been, fully known to plaintiff before it computed its bid". Even if the invitation for bids should fail to state that requests for interpretation of the specifications and drawings are to be made to the Government agency (unlike the Beacon Construction case, there was no such warning found in the instant invitation), it would seem that the obligation to seek clarification as to a patent ambiguity is inherent. See WPC Enterprises, Inc. v. United States supra, 323 F.2d at 877, 163 Ct.Cl. at 7. However, contractors are business men, and in the business of bidding on Government contracts they are

usually pressed for time and are consciously seeking to underbid a number of competitors. Consequently, they estimate only on those costs which they feel the contract terms will permit the Government to insist upon in the way of performance. They are obligated to bring to the Government's attention major discrepancies or errors which they detect in the specifications or drawings, or else fail to do so at their peril. But they are not expected to exercise clairvoyance in spotting hidden ambiguities in the bid documents, and they are protected if they innocently construe in their own favor an ambiguity equally susceptible to another construction, for as in Peter Kiewit Sons' Co. v. United States, 109 Ct.Cl. 390, 418 (1947), the basic precept is that ambiguities in contracts drawn by the Government are construed against the drafter. In the case before us the ambiguity was subtle, not blatant; the contractor was genuinely misled and not deliberately seeking to profit from a recognized error by the Government. Under these circumstances the contractor falls within the scope of the recognized formula.

For these reasons, the plaintiff is entitled to recover the extra expense caused by the Government. The amount of recovery will be determined under Rule 47(c).