**SOLAR TURBINES INTERNATIONAL**

v.

**The UNITED STATES.**

No. 373–80C.

United States Claims Court.

June 15, 1983.

Walter F. Pettit, San Francisco, Cal., for plaintiff; Julie B. Bannerman, Lewis Kent and Pettit & Martin, San Francisco, Cal., of counsel.

Timothy F. Noelker, Washington, D.C., with whom was Acting Asst. Atty. Gen., Stuart E. Schiffer, Washington, D.C., for defendant; Elizabeth Langer and Harland G. Woody, Washington, D.C., of counsel.

## OPINION

MILLER, Judge:

This case is before the court on cross-motions for summary judgment.[1] Plaintiff, Solar Turbines International (Solar), seeks reversal under the Wunderlich Act, 41 U.S.C. §§ 321–22 (1976) of a decision[2] by the Armed Services Board of Contract Appeals (ASBCA or the Board) denying claims by Solar for itself and on behalf of its principal subcontractor, Teledyne Inet, Inc. (Inet), for an equitable adjustment in the contract price for increased costs incurred under a 5-year requirements contract.

Plaintiff contends that the contract was for the purchase by the government in each of the 5 years of stated minimum quantities of the items set forth in the contract schedule, with orders to be placed at the beginning of each year, so as to enable plaintiff and Inet to achieve continuous levelized and economical production of the items; whereas, it charges, the government constructively changed the contract by taking the position that the contract merely required it to purchase its requirements for the items from the plaintiff as needed and by placing its orders on a haphazard and arbitrary basis. Defendant adheres to the view that the contract only bound it to purchase its requirements exclusively from plaintiff at the fixed prices, without regard to any particular dates or minimum quantities, and that the quantities referred to in the contract were merely the government's best estimates of its potential requirements set forth for plaintiff's convenience. Plaintiff also contends and defendant denies that the government terminated part of the contract for its own convenience by failing to order some of the items. The Board having upheld defendant's view of the contract and ruled that there was no termination for convenience, defendant urges affirmance of the Board's decision.

Both parties' motions are denied and the case is remanded to the ASBCA for further proceedings, as set forth hereinafter. The pertinent facts and reasons follow.

On March 27, 1968, the Air Force awarded to Solar Contract No. F04606–68–D–0643 (the contract). In the contract, the government agreed to purchase within maximum limits exclusively from Solar and, in return, Solar agreed to supply at level prices the Air Force's requirements for 5 years for two types of power plants and two types of generator sets.

The power plants and additional generator sets were for use in the field, primarily for the operation of highly mobile communications and electronic equipment for the command and control of tactical air operations, including radios, radar, telephones, computers and shelters for equipment and personnel.

The contract originated with the Sacramento (California) Air Material Area (SMAMA), which is part of the Air Force Logistics Command and is located at McClellan Air Force Base. The solicitation which resulted in the contract was actually the second attempt to make the procurement. SMAMA had initially issued a Letter Request for Technical Proposals on the power plants and generator sets in March 1967. Following evaluation of the proposals, and as a second step in the procurement, it sent Invitations For Bids (IFB) to the three firms that had submitted acceptable proposals. This second-step invitation contemplated a one-year indefinite quantity contract with options allowing the government to extend the contract up to 4 years. It requested bids on an incremental basis in

---

1. These motions previously were before the former United States Court of Claims, but in a *per curiam* order filed March 16, 1982, the court returned the case to its Trial Division explaining that, in light of the novel issues and lengthy record, decision of the matter would be aided through an evaluation of the issues and a recommended decision by a trial judge. On October 1, 1982, the case was transferred to the United States Claims Court pursuant to § 403(d) of the Federal Courts Improvement Act of 1982, Pub.L. 97–164, Title III, 96 Stat. 25, 58, 28 U.S.C.A. § 171 note (West Supp. 1983). Thereafter, the judge to whom the case was referred retried, and the matter subsequently was reassigned to this judge.

2. *Solar, A Division of International Harvester Company,* ASBCA Nos. 20610 and 21619, 80–1 BCA ¶ 14,303.

accordance with a schedule of quantity ranges, and it stated a guaranteed minimum and maximum for each of the two types of power equipment. However, as a result of a protest from Solar, the Air Force determined that there were major deficiencies in the procurement and that the invitation should be cancelled and readvertised.

The second invitation, which gave rise to the contract herein involved, was issued in February 1968. That invitation and contract contained four principal contract line items (CLINS). CLINS 1 and 2 were for power plants and CLINS 3 and 4 covered generator sets. The Air Force's anticipated requirements for the equipment were listed in the contract Schedule, which set forth, on a year by year basis, its "Best Estimated Quantity" (BEQ) and "Maximum Quantity" for each of the four CLINS as follows:

| CLIN NO. | | 1st Year | 2nd Year | 3rd Year | 4th Year | 5th Year |
|---|---|---|---|---|---|---|
| 1 | BEQ | 10 | 24 | 68 | 56 | 45 |
| | MAX QTY | 25 | 50 | 100 | 100 | 75 |
| 2 | BEQ | 35 | 40 | 54 | 52 | 13 |
| | MAX QTY | 50 | 75 | 100 | 100 | 50 |
| 3 | BEQ | 40 | 5 | 34 | 91 | 60 |
| | MAX QTY | 75 | 25 | 75 | 150 | 100 |
| 4 | BEQ | 1 | 5 | 5 | 5 | 5 |
| | MAX QTY | 10 | 25 | 25 | 25 | 25 |
| TOTALS | | | | | | |
| Power Plants | BEQ | 45 | 64 | 122 | 108 | 58 |
| (CLINS 1 & 2) | MAX QTY | 75 | 125 | 200 | 200 | 125 |
| Generator Sets | BEQ | 41 | 10 | 39 | 96 | 65 |
| (CLINS 3 & 4) | MAX QTY | 85 | 50 | 100 | 175 | 125 |

Thus the aggregate BEQ for all 5 program years was 397 power plants (CLINS 1 & 2) and 251 generator sets (CLINS 3 & 4). Since there were two generators per power plant, the total BEQ was the equivalent of 1,045 generators or engines. The maximum quantity which the government could order was 725 power plants and 535 generator sets, or the equivalent of 1,985 engines. The schedule stated that the government intended to order the entire BEQ of each CLIN shown for the first program year at the time of issuance of its first delivery order.

Although the price per unit was fixed, to insure that the contractor would receive sufficient revenues from government orders to recover its non-recurring start-up costs, the contractor was also entitled to an addi-

tional 5 percent of the aggregate amount of the BEQs reduced by the ratio of the dollar amount of the actual orders to the aggregate BEQ dollar amount.

On May 13, 1968, Solar submitted a value engineering change proposal which suggested the elimination of the production items from CLINS 1 and 3 and the reallocation of those items to CLINS 2 and 4. Solar explained that with minor modifications the functions of the CLIN 1 and 3 items could be performed by the CLIN 2 and 4 items respectively. The government accepted the proposal and, on October 11, 1968, the parties executed an agreement to that effect. The following table reflects the revised BEQ quantities of the four CLINS, as well as the actual orders for each CLIN placed by the government each year.[3] Although

---

**3.** The October 11 modification was made after the government had placed its first two orders, one of which was the promised order for the original BEQ quantity for each CLIN shown for

the first program year. Accordingly, the delivery orders were revised to reflect the new agreement. The table shows the actual orders as modified by the October 11 agreement. In

the maximum quantities were also modified, those quantities are not relevant to the decision in the case and accordingly are not shown below.

| CLIN | | 1st Year | 2nd Year | 3rd Year | 4th Year | 5th Year | Total |
|---|---|---|---|---|---|---|---|
| 1 | BEQ | 3 | 0 | 0 | 0 | 0 | 3 |
| | ACTUAL | 3 | 0 | 0 | 0 | 0 | 3 |
| 2 | BEQ | 42 | 64 | 122 | 108 | 58 | 394 |
| | ACTUAL | 129 | 5 | 162 | 111 | 125 | 532 |
| 3 | BEQ | 1 | 0 | 0 | 0 | 0 | 1 |
| | ACTUAL | 1 | 0 | 0 | 0 | 0 | 1 |
| 4 | BEQ | 40 | 10 | 39 | 96 | 65 | 250 |
| | ACTUAL | 44 | 3 | 9 | 0 | 35 | 91 |

Solar argues that the Board erred as a matter of law in finding that, other than for the first year, the BEQs set forth in the contract schedule were not known, annual quantities, which the government was obligated to order at the beginning of each program year. Solar argues that under the rule of *contra proferentem* the government must be bound by Solar's reasonable interpretation of the term.

In order to prevail under the rule of *contra proferentem,* Solar must establish that its interpretation of the disputed language was within the "zone of reasonableness" and that it reasonably relied on that interpretation in the course of bidding or performance. *Dale Ingram, Inc. v. United States,* 201 Ct.Cl. 56, 72, 475 F.2d 1177, 1185–86 (1973); *WPC Enterprises, Inc. v. United States,* 163 Ct.Cl. 1, 6, 323 F.2d 874, 876 (1963). Solar states that five factors reasonably led it to interpret the BEQs to mean firm orders that had to be placed within the program year specified: the contract Schedule, Armed Services Procurement Regulations (ASPR) § 1–322,[4] the government's response to an inquiry at the 1967 bidders' conference, the Glossary of Terms, and "practical considerations."

Solar argues initially that the fact that the contract Schedule listed the BEQs for each CLIN and did so on a yearly basis, rather than cumulatively, reasonably indicated to it that the BEQs were minimum orders which the government was required to order in each particular year. But this interpretation directly conflicts with Part XX of the contract, the Requirements clause, which provides in part:

(a) This is a requirements contract for the supplies or services specified in the Schedule, and for the period set forth therein. Delivery of supplies or performance of services shall be made only as authorized by orders issued in accordance with the clause entitled "Ordering".

*The quantities of supplies or services specified herein are estimates only, and are not purchased hereby. Except as may be otherwise provided herein, in the event the Government's requirements for supplies or services set forth in the Schedule do not result in orders in the amounts or quantities described as "estimated" or "maximum" in the Schedule, such event shall not constitute the basis for an equitable price adjustment under this contract.* [Emphasis supplied.]

Second, the contract Schedule setting forth the BEQs was prefaced by the following sentence:

addition, the parties agreed in February 1969 to a partial termination for the convenience of the government with respect to 39 of the 44 CLIN 4 items shown as actual orders in the first year. There was no actual loss of business·as a result of this termination, however, since the agree-

ment increased the order for CLIN 2 power plants by 20. This increase in CLIN 2 actual orders is also reflected in the table which follows.

4. 32 C.F.R. § 1.322 (1968).

Set forth below are the Government's *anticipated requirements* for * * *. Power Plants and * * * Generator Sets for the next five (5) years. [Emphasis supplied.]

Third, Part XIX of the contract stated that "[t]he Government reserves the right to issue orders * * * from the date of award through a 60 month period subsequent to date of award." This conflicts with the plaintiff's position that the estimates had to be placed as orders at the beginning of each year.

Fourth, the Schedule does not refer to any minimum quantity but only to Best Estimated Quantity and Maximum Quantity. Had minimum quantity been intended, it would have been perfectly natural to refer to minimum and maximum quantities as the two opposite limits. But plaintiff advances no logical reason why the parties would have been willing to use the term "estimated" if they meant "minimum."

Fifth, Part XVI of the contract, the Cancellation Ceiling Cost clause, also is inconsistent with plaintiff's argument. This clause provides:

*Cancellation Ceiling Cost*

The contractor will be entitled to 5% cancellation costs of the aggregate dollar amount for the BEQ of the individual Items 1 & 1AA, 2 & 2AA, 3 & 3AA, 4 & 4AA for all five program years. Concurrent with the issuance of each successive delivery order, the 5% cancellation ceiling will be reduced in a proportionate ratio of the dollar amount ordered to the aggregate BEQ dollar amount.

The Board found that the "Cancellation Ceiling Cost" clause represented the government's promise to reimburse the contractor for non-recurring costs not otherwise recovered. Plaintiff does not disagree with this finding. But if, as plaintiff argues, the BEQs were the government's promise of minimum orders and plaintiff became entitled to an equitable adjustment for any shortfall, the Cancellation Ceiling

Cost clause limiting plaintiff to 5 percent increased compensation for a shortfall would be purposeless.[5]

That Solar was aware that the government was not obligated to order the entire BEQ and that the Cancellation Ceiling Cost clause was the only remedy for a shortfall is also made plain from a question and answer at a bidder's conference on March 8, 1968, the minutes of which record the following:

Mr. Scherer, Solar representative, asked if during any one multi-year period an order is issued for 1 each unit only of a particular item, would this result in cancellation of the balance of that item.

Answer: Yes. Cancellation ceiling would then be paid for the balance of the total BEQ for that specific item.

Plaintiff's next argument relies on ASPR § 1–322, which sets forth the procedures, policy, clauses and other matters relating to multi-year procurement. ASPR § 1–322 states that "Multi-year procurement is a method for competitive contracting for known requirements for military supplies, in quantities and total cost not in excess of planned requirements for 5 years." Since ASPR § 1–322 provides for procurement of *known* requirements in connection with multi-year contracts, plaintiff argues, it was reasonable for Solar to conclude that the "Best Estimated Quantities" in the multi-year *requirements* contract at issue are "known" requirements, and not estimated quantities.

This argument makes no sense. Plaintiff could not reasonably have believed that the terms of ASPR § 1–322 were impliedly written into the contract, since, as has already been noted, it would require disregard of the express terms of the Requirements clause in the contract. Moreover, it would require disregard of other sections of the regulations. ASPR § 1–322 authorizes the procurement of known quantities of military supplies over several years under restricted conditions, but another equally

**5.** The 5 percent figure is made more significant by the fact that it was bargained for. Originally the IFB set the cancellation ceiling cost percentage at 2½ percent while the contractor proposed 11 percent, but the parties compromised at 5 percent.

valid section of the same ASPRs authorizes the letting of requirements contracts over specified periods where the precise quantities are not fully known, to wit:

§ 3.409–2 Requirements contracts

(a) *Description.* This type of contract provides for filling all actual purchase requirements of specific supplies or services of designated activities during a specified contract period with deliveries to be scheduled by the timely placement of orders upon the contractor * * *. Depending on the situation, the contract may provide for (1) firm fixed prices, (2) price escalation, or (3) price redetermination. An estimated total quantity is stated for the information of prospective contractors, which estimate should be as realistic as possible. The estimate may be obtained from the records of previous requirements and consumption, or by other means. * * * Funds are obligated by each order and not by the contract itself.

(b) *Applicability.* A requirements contract may be used for procurements where it is impossible to determine in advance the precise quantities of the supplies or services that will be needed by designated activities during a definite period of time.

In its brief, Solar states that its "in-house counsel logically and prudently reviewed [the] ASPR multi-year provisions prior to bidding." But in determining the nature of the instant contract, neither Solar nor its counsel was entitled to rely on ASPR § 1–322 to the exclusion of both the actual Requirements clause in the contract and the regulations authorizing requirements contracts.

Moreover, for still another reason, plaintiff could not reasonably have inferred that ASPR § 1.322 was incorporated into the contract. As the Board pointed out, Congress appropriates funds for only a single year's obligations, and the Anti-Deficiency Act[6] prohibits anyone from obligating the government in excess of the dollars appropriated by Congress. Accordingly, ASPR

§ 1.322–5 requires the insertion in every multiple year procurement contract of a Limitation of Price and Contractor Obligations clause. This clause provides that because funds are only available for a single year at a time, and because for each successive contract year, until funds are made available, neither the government nor the contractor is obligated to perform, the contracting officer is required to notify the contractor as soon as funds become available so as to trigger the obligations of the contractor to perform and of the government to pay. This clause nowhere appears in the instant contract.

Plaintiff's next argument is that BEQs reasonably meant minimum quantities because in a 1967 bidders conference the government advised bidders that "There is a possibility that the * * * procurement may provide for multi-year procurement in accordance with ASPR 1–322," and then, in response to a bidder's question "What is the minimum quantity of units the Air Force is committed to procure on this proposal?", the government replied "BEQ or cancellation charges will be paid for [the] difference between units purchased and BEQ."

However, there was substantial evidence to support the Board's findings that the March 1967 conference, upon which plaintiff relies, was in relation to an earlier solicitation that contemplated a different kind of proposed contract containing both best estimated *and* guaranteed minimum and maximum quantities, and which was cancelled; that the response was directed to the government's obligation under such multi-year procurement contract; and therefore that it was not reasonable for plaintiff to have relied on what was said at the 1967 conference in arriving at its interpretation of the contract the parties entered into in 1968. Moreover, plaintiff should specifically have been alerted to the differences by the absence of guaranteed minimum quantities in the 1968 contract and by the Cancellation Ceiling Cost clause (discussed at p. 494, *supra*), inserted in

6. 31 U.S.C. § 665 (1964), revised by Pub.L. 97–258, 96 Stat. 877, 923 (No. 8 U.S.Code Cong. & Ad.News (Oct. 1982)) and currently at 31 U.S.C.A. § 1341(a) (West 1983).

March 1968, which set out the limited relief to which plaintiff was entitled should there be a shortfall of government orders below the best estimate.

Next Solar claims that item of the contract Glossary of Terms supports its argument that BEQ equals "known" or "minimum" quantities. That item provided:

> For the purpose of this Contract, Program Year Requirements and Best Estimated Quantity, shall be construed as having the same meaning and to be interchangeable with each other.

The Board found that such item of the Glossary was included in the IFB on March 12, 1968, as a result of a written question from Solar at a bidders' conference on March 8, 1968, as to the meaning of the term "Program Year Requirements" in Part XXIX of the contract, the Cancellation of Items clause. Part XXIX stated that "This clause applies only in the event this contract is awarded on the alternative basis for award described in the Schedule as 'Multi-Year Procurement'." That clause provided for payment of a cancellation charge if funds were not made available for performance of the "Program Year Requirement" for a succeeding program year under a Multi-Year Procurement contract, to cover expenses necessary for production which would have been equitably amortized in the unit prices for the entire quantity of the multi-year procurement, but which, because of the cancellation, were therefore not so amortized. Solar complained that the IFB did not make clear whether the meanings of "Program Year Requirements" and "Best Estimated Quantity" used elsewhere in the contract, were the same "for cancellation purposes." As previously noted, in Part XVI the Cancellation Ceiling Cost clause provided that the contractor

would be entitled to 5 percent of the aggregated dollar amount of the BEQ reduced by the actual orders.[7] The Board found that the government answered the question by stating the terms were interchangeable, and by placing this in the Glossary of Terms in the contract—thus making clear that whether the government awarded the contract as a requirements contract or as a multi-year procurement, the contractor would be entitled to recapture cancellation costs either for cancellation of the BEQ or the Program Year Requirements, because both terms had the same meaning in connection with the cancellation provisions. (80–1 BCA at 70,427.)

In effect, in order to support its argument, plaintiff turns the question and answer on its head. At the bidders' conference, Solar indicated that it understood "Best Estimated Quantity" for purposes of the Cancellation Ceiling Cost clause in the potential Requirements contract, but it did not comprehend "Program Year Requirements" for purposes of the Cancellation of Items clause in the alternative Multi-Year Procurement contract. After receiving the response that it could use the Best Estimated Quantity figures for purposes of the cancellation clause in the latter, as well as in the former, to assure recapture of cancellation costs, now it argues that by this answer the government changed Best Estimated Quantity into a firm known or minimum figure for all purposes and thereby changed the Requirements contract into a multi-year procurement contract.

Finally, the "practical considerations" Solar urges are of little help. Solar argues that under the government's position the contractor is exposed to the risks of unpredictable orders for unpredictable quantities,

---

7. The question was stated as follows:

*Cancellation.* ASPR Section 1–322. 1(a) states that the contractor is protected against loss resulting from cancellation by contract provisions allowing reimbursement of unrecovered non-recurring costs included in prices for cancelled items. It is not clear in the clause set forth in Part XXIX and the balance of the Invitation for Bids that the term 'Program Requirements' used in Part

XXIX and 'Best Estimated Quantity' used elsewhere are the same for cancellation purposes. If they are not the same, over what quantity should nonrecurring costs be amortized to insure recovery in the event of cancellation. If definitive Program Requirements cannot be stated for the purpose of cancellation, request that preproduction units be established as a separate item. 80–1 BCA at 70,403.

whereas Solar's interpretation avoids these risks. This may be true, but it cannot change the fact that those are the precise risks contemplated by the contract and the government was given no reason to believe that Solar or any other contractor did not fully appreciate those risks.

In one section of its brief, plaintiff places itself in the sympathy-deserving posture of "businessmen, who, because they [were] faced with the time constraints and pressures of competitive bidding * * * innocently construe[d] the ambiguities inherent in melding 'multi-year' and 'requirements' concepts to conclude that the BEQs were minimum, annual requirements." But in another section, plaintiff concedes that its in-house counsel reviewed the format of the procurement and the ASPR provisions prior to the plaintiff's submission of its bid. Whichever of these inconsistent statements is the fact, it is nevertheless concluded that Solar's alleged interpretation of the contract is not within the zone of reasonableness.

 Moreover, even if the evidence Solar cites plainly supported its argument, Solar still could not prevail. A corollary to the rule of *contra proferentem* provides that a patent, glaring or obvious interpretive problem places the contractor under a duty to seek clarification thereof, and the failure to satisfy this duty will preclude consideration of whether the contractor's interpretation should be adopted. *George Hyman Constr. Co. v. United States,* 215 Ct.Cl. 70, 80–81, 564 F.2d 939, 945 (1977); *S.O.G. of Arkansas v. United States,* 212 Ct.Cl. 125, 128–29, 546 F.2d 367, 369 (1976); *Beacon Constr. Co. v. United States,* 161 Ct.Cl. 1, 6–7, 314 F.2d 501, 504 (1963). Indeed, saying that a contractual provision contains a patent ambiguity is tantamount to saying that no reasonable interpretation of the provision can be made unilaterally by the contractor. *Brezina Constr. Co. v. United States,* 196 Ct.Cl. 29, 34–35, 449 F.2d 372, 375 (1971). Furthermore, if the contractor in fact knows of the ambiguity, the duty to inquire arises irrespective of whether the ambiguity is patent. As the court stated in

*James A. Mann, Inc. v. United States,* 210 Ct.Cl. 104, 123, 535 F.2d 51, 61 (1976):

> The question of whether an ambiguity is patent is *only* relevant where the contractor was not aware of it, and the court is called upon, in retrospect, to decide whether or not he *should have been* aware of it. [Citations omitted.] It is clear in this case that the alleged ambiguity was known to the plaintiff before it submitted its bid. * * * Having this knowledge, plaintiff was required to seek clarification from the contracting officer. This it failed to do. [Emphasis in original.]

 In this case plaintiff was under a duty to seek clarification for both reasons. First, in the face of the explicit Requirements clause, Solar's interpretation of the BEQ to mean minimum, annual orders at most would *produce* an ambiguity. Because Solar fails to show how its interpretation can be reconciled with the plain meaning of the Requirements clause, the ambiguity must be deemed patent, glaring or obvious, thereby giving rise to a duty to inquire.

Second, Solar asserts in its briefs that "the contract was plainly susceptible of more than defendant's interpretation when the plaintiff bid," and that Solar "innocently construe[d] the ambiguities inherent in melding 'multi-year' and 'requirements' concepts to conclude that the BEQs were minimum, annual requirements." Thus, Solar acknowledges that it perceived the BEQs to be ambiguous before it submitted its bid, and that it resolved the ambiguity unilaterally. But a contractor with knowledge of an ambiguity is under a duty to inquire and may not resolve the ambiguity on its own. *James A. Mann, Inc. v. United States, supra.*

Nevertheless, Solar did not inquire. At the 1968 conference, Solar asked only two questions, both of which related specifically to entitlement to cancellation and recovery of non-recurring start-up costs. At no time did Solar directly inquire as to whether the BEQs were estimates or firm orders. Nor could Solar's two questions have put the

government on notice that Solar thought the BEQs in the contract Schedule were ambiguous or reasonably susceptible to the interpretation Solar now urges. This failure to satisfy its duty to inquire should preclude consideration of Solar's preferred interpretation even if the BEQs could be considered ambiguous.

The ASBCA's construction of the contract was in accord with what has been stated herein, but the Board also found that prior to the award and during the performance of the contract Solar's conduct was not consistent with its claim that it relied on a reasonable construction of the contract pursuant to which the government was required to place orders each year for at least the BEQ of power plants and to do so at the beginning of each year. The Board found:

1. That Solar conducted pre-award marketing surveys to determine what orders would be placed; and these would not have been necessary if it had thought the BEQs were firm quantities to be ordered each year by the government.

2. That during the period of contract performance, Solar's sales representatives contacted SMAMA and the Electronic Systems Division of the Air Force Systems Command, located at Bedford, Massachusetts, on a monthly basis, for the purpose, among others, to extract information from them as to likely government requirements for future orders, so that Solar could rely on sales forecasting for assistance in making decisions regarding the purchase or production of parts and materials; and that if Solar had relied solely on receiving an order for the BEQ at the beginning of each program year for its planning, this would have been wasteful of time and effort.

3. That the lead time required for planning and ordering parts and supplies for the power plants was at least 10½ months, while the contract required Solar to deliver the equipment in only 150 days (5 months); and, therefore, plaintiff in fact purchased parts and supplies for inventory in reliance on sales forecasts as to future government requirements rather than on receiving actual orders prior to each program year.

4. That Solar's principal subcontracts required no regular production, that such subcontractors normally received an order when Solar received one from the government, and that the subcontracts imposed no greater obligation on Solar to order goods and services than Solar's own contract placed on the government.

Plaintiff does not contend that there is no substantial evidence to support the evidentiary facts on which these findings are based but refers to other evidence to dispute the inferences which the Board draws from them. However, in view of the clear evidence as to the meaning of the contract, it is unnecessary to resolve such questions, since plaintiff's understanding of the contract is irrelevant. For, as the court stated in *L.S.S. Leasing Corp. v. United States,* 695 F.2d 1359, 1364 (Fed.Cir.1982) (quoting from Judge Learned Hand in *Hotchkiss v. National City Bank of New York,* 200 F. 287, 293 (S.D.N.Y.1911), *aff'd,* 201 F. 664 (2d Cir.1912), *aff'd,* 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913)):

> A contract has, strictly speaking, nothing to do with the personal, or individual intent, of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. If, however, it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes upon them, he would still be held, unless there were some mutual mistake or something else of the sort. Of course, if it appear by other words, or acts, of the parties, that they attribute a peculiar meaning to such words as they use in the contract, that meaning will prevail, but only by virtue of the other words, and not because of their unexpressed intent.

Plaintiff contends further that the government partially terminated the contract for its own convenience, thereby entitling the plaintiff to an equitable adjustment of the contract price under the contract clause applicable to such a termina-

tion. As may be observed from the tabulation (together with the footnote) at pages 492–93, *supra,* the BEQ for one of the four line items, CLIN 4 generator sets, totalled 250 for the 5 years, whereas the government actually ordered and purchased only 52.

Plaintiff's argument on this matter assumes the same premise which has hereinbefore been found to be erroneous, namely that the contract was for procurement of known quantities at the beginning of each year and not merely for the government's requirements as they arose. To invoke the Termination for Convenience clause, plaintiff relies on Part XXIX of the contract, the Cancellation of Items clause. This clause provides that if the government cancels a multi-year Procurement Contract for reasons other than default and other than the fact that Congress has not made the necessary funds available for a subsequent program year, it will be considered a termination in accordance with the Termination for Convenience of the Government clause. Plaintiff argues that there was such a termination because the government had the necessary funds for acquiring the CLIN 4 items but nevertheless underordered the quantities specified in the contract.

The short answer to the plaintiff's contention is that by its own terms the Cancellation of Items clause is not applicable to the instant Requirements contract. The opening paragraph of that clause states:

(a) This clause applies only in the event this contract is awarded on the alternative basis for award described in the Schedule as "Multi-Year Procurement".

The appropriate clause which does apply to the government's failure to order the total BEQ is Part XVI, the Cancellation Ceiling Cost clause, which, as previously noted, provides that:

The contractor will be entitled to 5% cancellation costs of the aggregate dollar amount for the BEQ of the individual Items 1 & 1AA, 2 & 2AA, 3 & 3AA, 4 & 4AA for all five program years. Concurrent with the issuance of each successive delivery order, the 5% cancellation ceiling will be reduced in a proportionate ratio of the dollar amount ordered to the aggregate BEQ dollar amount.

■ However, there is a proper dispute between the parties as to whether this clause applies to each contract line item separately or only to the contract as a whole. As noted, the government ordered less than the total BEQs for CLIN 4 generators for the 5 years and therefore the application of the clause to CLIN 4 alone would entitle Solar to a cancellation ceiling cost allowance. On the other hand, the Board found that the government ordered total contract items having an aggregate price of at least $21,577,972, as against an aggregate BEQ value of only $20,409,419, and application of the Cancellation Ceiling Cost clause to these sums would result in plaintiff being entitled to zero dollars.

The Board agreed with defendant that the clause applied to the total BEQs and orders under the contract and not to each line of items and accordingly awarded plaintiff nothing.

In this regard the court agrees with plaintiff and determines that the Board's construction of the Cancellation Ceiling Cost clause was erroneous, for the following reasons:

1. Each CLIN was priced separately in the bid, so that, if they had been separately contracted for, plaintiff would have been entitled to the adjustment under each contract.

2. Apart from the foregoing, the literal language of the clause as applied to the contract schedule of line items sheds no light on the subject, and one interpretation is as reasonable as another. Under such circumstances, pursuant to the rule of *contra proferentem,* the ambiguity should be interpreted against the government, which drafted the clause. *George Bennett v. United States,* 178 Ct.Cl. 61, 64, 371 F.2d 859, 861 (1967); *Blount Bros. Constr. Co. v. United States,* 171 Ct.Cl. 478 at 495–97, 346 F.2d 962 at 972–73; *Peter Kiewit Sons' Co. v. United States,* 109 Ct.Cl. 390, 418 (1947).

3. If the purpose of the clause is to reimburse the contractor for non-recurring start-up costs not recouped by the contractor out of revenues from the sales of the item because of insufficient sales, it would not necessarily follow that sales of other items in excess of estimates provide sufficient margins of profit to enable recoupment of the costs of the first item.

4. Note again the government's response to the question put by the plaintiff at the bidders' conference on March 8, 1968:

> Mr. Scherer, Solar representative, asked if during any one multi-year period an order is issued for 1 each unit only of a particular item, would this result in cancellation of the balance of that item.
>
> Answer: Yes. Cancellation ceiling would then be paid for the balance of the total BEQ *for that specific item.* [Emphasis supplied.]

The reference to payment for the balance of the BEQ for that specific item also tends to support an interpretation of the clause in favor of plaintiff.

Accordingly, for the reasons set forth herein, both motions for summary judgment are denied.

Pursuant to the authority of 28 U.S.C.A. § 1491(a)(2) (West Supp.1983), and Rule 60.1 of this court, this case is remanded to the ASBCA to determine the amount due to plaintiff under the Cancellation Ceiling Cost clause, Part XVI of its contract with the United States. Proceedings in this case are stayed for a period not exceeding 6 months to await the determination of the ASBCA. The attorney of record for the plaintiff is designated to report to the court the status of the proceedings on remand at intervals of 90 days or less, beginning with the date of this opinion. Proceedings thereafter shall be in accordance with Rule 60.-1(b).